No. 89,620

STATE OF KANSAS, *Appellee,* v. ANDREW JACKSON, *Appellant.*

(118 P.3d 1238)

Cert. den. March 1, 2006

Opinion filed September 9, 2005.

*Sandra M. Carr,* assistant appellate defender, argued the cause and was on the briefs for appellant.

*Sheryl L. Lidtke,* assistant district attorney, argued the cause, and *Nick A. Tomasic,* district attorney, and *Phill Kline,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: This is Andrew Jackson's direct appeal of his jury convictions of first-degree premeditated murder, kidnapping, and conspiracy to commit murder.

Numerous trial errors which we will separately consider are alleged. We first set forth the sad facts and proceedings giving rise to this appeal.

Jackson met Bovi Combs and Shecora Clanton while riding buses in Kansas City, Missouri. Their chance meeting resulted in the murder of Delesha Williams, a woman Combs met at a bus stop in Kansas City, Missouri.

Combs wanted to kill Williams because he believed she was involved in his sister's death. Clanton, who was Combs' girlfriend, agreed to help. They planned to steal items from Williams' house after the murder. Combs and Clanton initially planned to poison Williams with strychnine but were unable to make such a purchase over the counter.

Clanton rented a U-Haul truck to carry the stolen property from Williams' house. After picking up the truck, Combs and Clanton returned to Clanton's house, where Combs called Jackson and inquired as to how Jackson would kill someone. Combs then paged Williams several times and waited at Clanton's house until 9:30 p.m., when Williams returned Combs' page.

Combs and Clanton then drove to Jackson's apartment to pick him up. When Combs and Clanton arrived, Jackson produced a syringe and a white chemical substance he had prepared for them. Jackson told them to stick Williams with the syringe and she would die. Although Jackson initially refused to go with Combs and Clanton because he thought they had waited until too late at night, he changed his mind and accompanied Combs and Clanton to Williams' house in Kansas City, Missouri.

As the trio was pulling up to Williams' house, they noticed a car in the driveway with its lights on. They drove past the house a couple of blocks before turning around and coming back. When they returned, the car was gone. Clanton parked the U-Haul truck, and Combs knocked on Williams' door. While Combs was at the front door, Williams' cousin walked up to the door. He had been in a minor car accident and needed a ride home. Williams opened the door for Combs and her cousin. Combs returned to the U-Haul truck a few minutes later with Williams' cousin and told Clanton and Jackson to drive Williams' cousin home.

After taking Williams' cousin home, Clanton and Jackson joined Combs and Williams at Williams' house. Williams did not have anything for them to drink, so Jackson walked to a nearby conven-

ience store and purchased soda and cigarettes. After visiting with Combs, Clanton, and Jackson for awhile, Williams decided to go to bed. She invited the trio to spend the night at her house.

Combs, Clanton, and Jackson waited for Williams to fall asleep so they could inject her with the chemical in Jackson's syringe. When Williams was asleep, Jackson hit Williams with a mallet and then jumped on top of her and started strangling her. Williams struggled with Jackson. The two fell off the bed and continued fighting on the floor. Jackson eventually subdued Williams and told Combs to get the syringe from his coat pocket. However, Jackson broke the syringe before he could inject Williams.

Without a syringe to poison Williams, Combs suggested that Jackson strangle her. Combs found an extension cord and gave it to Jackson. Jackson broke the extension cord before he could strangle Williams, so he asked Combs for another one. Before Combs could find another extension cord, Jackson told Combs that he was tired of struggling with Williams. Combs suggested that Jackson stab Williams, but Jackson told Combs that if he wanted Williams dead, he would have to do it himself.

Combs took a knife and began slashing and stabbing Williams until he bent the knife. While Combs went to the kitchen to get another knife, Williams managed to crawl out of her bedroom into the hallway. Combs slashed at Williams again and kicked her in the face and the stomach. Williams appeared to be unconscious, lying in a puddle of blood in the hallway. She had multiple injuries to her head, neck, and shoulders caused by blunt force impacts, the attempted strangulation, and the stabbings and slashes with the knife.

Because Combs wanted to have all of Williams' things loaded into the U-Haul before Williams' mother returned home from work, they left Williams lying in the hallway and began loading things into the U-Haul truck. They took a big screen television (TV), two smaller TV's, a video cassette recorder, and several telephones. Before leaving, they loaded Williams into the back of the U-Haul truck. Jackson told police that Williams walked to the back of the U-Haul truck and Combs threw her in.

Clanton drove Jackson back to his apartment in Kansas City, Missouri, where he got into the back of the U-Haul and retrieved a small television to take with him. Jackson told Combs to never call again and "you never heard of me." Combs and Clanton then drove to a store and purchased a padlock for the back of the U-Haul truck before driving back to Clanton's house in Kansas City, Missouri. After staying at Clanton's house for about 30 minutes, Combs and Clanton left in the U-Haul truck to deliver the big screen TV to Combs' uncle. While they were driving, Clanton heard Williams' screams from the back of the U-Haul. Combs suggested that Clanton find a wooded area to dump Williams' body, so Clanton drove to a wooded area near Washington High School in Kansas City, Kansas. At this point, Combs threw Williams from the truck, hit her with a large log, drove back and forth over her upper torso several times, and threw her body into the woods.

Combs and Clanton were arrested a few hours later, and both gave statements to the police implicating Jackson. Jackson turned himself in to Kansas City, Missouri, police a few days later. Clanton testified extensively at Jackson's trial. A jury convicted Jackson of first-degree premeditated murder, kidnapping, and conspiracy to commit murder. The district court sentenced Jackson to a hard 50 life sentence.

Jackson appeals his convictions and his sentence directly to this court pursuant to K.S.A. 22-3601, raising a number of issues. He first claims that Kansas does not have jurisdiction to prosecute him. If we conclude that Kansas has jurisdiction, Jackson contends his statutory right to a speedy trial was violated; the trial court failed to properly instruct the jury; the trial court erroneously admitted evidence, including gruesome photographs, hearsay statements, and his involuntary confession; he did not receive a fair trial because of cumulative errors; and, finally, his convictions are not supported by sufficient evidence. If we affirm Jackson's convictions, he argues the hard 50 sentencing scheme is unconstitutional or, in the alternative, that his hard 50 sentence is not supported by sufficient evidence.

## JURISDICTION

Jackson claims that Kansas does not have subject matter jurisdiction over the charged offenses because he never entered the state of Kansas or committed any act within Kansas. An appellate court reviews a question of subject matter jurisdiction using a de novo standard. *State v. James*, 276 Kan. 737, 744, 79 P.3d 169 (2003).

Subject matter jurisdiction for crimes in Kansas is controlled by K.S.A. 21-3104, which provides in pertinent part:

"(1) A person is subject to prosecution and punishment under the law of this state if:

(a) He commits a crime wholly or partly within this state; or

(b) Being outside the state, he counsels, aids, abets, or conspires with another to commit a crime within this state; or

(c) Being outside the state, he commits an act which constitutes an attempt to commit a crime within this state.

"(2) An offense is committed partly within this state if either an act which is a constituent and material element of the offense, or the proximate result of such act, occurs within the state. If the body of a homicide victim is found within this state, the death is presumed to have occurred within the state."

Although K.S.A. 21-3104 has been interpreted broadly, *State v. Grissom*, 251 Kan. 851, 889, 840 P.2d 1142 (1992), this court has recognized limits to its application. See *State v. Palermo*, 224 Kan. 275, 277, 579 P.2d 718 (1978). In *Palermo*, the State sought review of the district court's decision to set aside the verdict and acquit the defendant on a charge of selling heroin. Palermo sold the drugs to a person in Missouri, who then sold the drugs to an informant in Kansas. Because Palermo did not come into Kansas and did not personally participate in the drug sale in Kansas, he was tried under an aiding and abetting theory. The *Palermo* court affirmed the district court's dismissal, holding that Kansas cannot assert jurisdiction over a crime under an aiding and abetting theory if the defendant never entered Kansas and could not reasonably foresee that his or her act would cause, aid, or abet the commission of a crime in Kansas. 224 Kan. at 277.

Relying on *Palermo*, Jackson argues it was not reasonably foreseeable that Combs and Clanton would take Williams to Kansas

and kill her. He argues that his participation in the events leading up to Williams' death ended hours before Combs and Clanton drove to Kansas, killed Williams, and dumped her body. Because he was not involved in any of the last-minute decisions, he contends he could not have known that Combs and Clanton would murder Williams and could not have aided and abetted in Williams' murder and kidnapping in Kansas. To analyze this argument, we must look at each charge individually to determine whether Combs' and Clanton's actions were reasonably foreseeable to Jackson.

Regardless of whether Jackson was involved in the last-minute decision making, it was certainly reasonably foreseeable that Combs and Clanton would finish the murder that Jackson helped start. Before they left the house, Jackson became weary of struggling with Williams and told Combs that if he wanted Williams dead, he could do it himself. Jackson told police that Williams walked to the back of the truck and Combs threw her in, indicating that Jackson knew Williams was alive in the back of the U-Haul when he got out at his apartment in Kansas City, Missouri. Jackson would have seen Williams in the back of the U-Haul truck when he retrieved a TV from it before he went into his apartment. Moreover, it was reasonably foreseeable that the beating, stabbing, and strangulation inflicted on Williams would disable her, making it easier for Combs and Clanton to finish the murder in some manner. Jackson's refusal to participate in the final decision-making or the final acts that ended Williams' life does not relieve him of responsibility because he knew or should have known that Williams would not survive.

Under the same reasoning, Williams' kidnapping was foreseeable and, in fact, was already occurring. Jackson knew that Combs and Clanton had Williams in the back of the U-Haul. It was foreseeable that Combs and Clanton would continue to confine Williams in the U-Haul until they could complete her murder. Jackson knew that Combs planned to get a padlock for the back of the U-Haul and told police about it during his interrogation. Jackson made no attempt to rescue Williams from the U-Haul truck or to prevent her impending death. He did not offer to take Williams with him when he got out of the U-Haul. He did not encourage

Combs and Clanton to let Williams go, and he did not call the police to alert them to Williams' presence in the back of the U-Haul truck. Instead, Jackson told Combs to get rid of his telephone number, not to call him anymore, and to forget he ever knew Jackson.

Even though it was reasonably foreseeable that Combs and Clanton would continue the kidnapping of Williams and complete the murder that Jackson had started, Jackson argues that it was not reasonably foreseeable that they would perform these acts in Kansas. This argument, however, overlooks Jackson's close proximity to Kansas and the mobility of the U-Haul truck. Jackson's apartment, Clanton's house, and Williams' house are all within 5 miles of the Kansas border. Clanton could easily drive the U-Haul truck 5 miles into Kansas to finish what the trio had started. The fact Jackson was not involved in the decision to go to Kansas does not make the trip unforeseeable.

The State prosecuted Jackson under an aiding and abetting theory for the crimes of first-degree premeditated murder and kidnapping. "Any person who counsels, aids, or abets in the commission of any offense may be charged, tried, convicted, and sentenced in the same manner as if he or she were a principal. [Citation omitted.]" *State v. Wakefield*, 267 Kan. 116, 142, 977 P.2d 941 (1999). Because it was reasonably foreseeable that Combs and Clanton would continue to confine Williams and drive to Kansas to complete the murder, the State has jurisdiction to prosecute Jackson for the crimes of first-degree premeditated murder and kidnapping under an aiding and abetting theory even though Jackson never personally entered Kansas.

Although the foreseeability analysis applies to the first-degree murder and kidnapping charges, it does not apply to the conspiracy charge. A conspiracy may be prosecuted in any jurisdiction where an overt act in furtherance of the conspiracy occurred, regardless of whether the defendant actually entered the state or district of trial. *State v. Campbell*, 217 Kan. 756, 779, 539 P.2d 329, *cert. denied* 423 U.S. 1017 (1975). The defendants in *Campbell* contended they could not be charged with conspiracy in Shawnee County because neither the agreement nor any overt act in which

they participated was alleged to have been committed there. The court noted the indictment alleged the conspiratorial agreement occurred in Shawnee County and 10 of the separately numbered overt acts occurred there. The *Campbell* court said: "It is immaterial that the particular complainants may never have entered Shawnee county during the existence of the conspiracy." 217 Kan. at 779. The *Campbell* court relied on *Downing v. United States*, 348 F.2d 594, 598 (5th Cir.), *cert. denied* 382 U.S. 901 (1965), and its holding that " '[a] conspiracy may be prosecuted in the district where it was formed or in any district in which an overt act was committed in furtherance of its objects.' " 217 Kan. at 779. The *Campbell* decision further relied on K.S.A. 21-3104.

In our case, the actual killing was an overt act in furtherance of the conspiracy to commit murder. Kansas clearly has jurisdiction to prosecute Jackson for conspiracy to commit murder because an overt act in furtherance of the conspiracy occurred in Kansas.

We hold that the State properly exercised its jurisdiction in prosecuting Jackson for the crimes of first-degree premeditated murder, kidnapping, and conspiracy to commit murder. We proceed to the other trial issues Jackson raises.

## SPEEDY TRIAL

Jackson was arraigned on October 10, 2001, and his trial was originally set for January 7, 2002, 89 days after his arraignment. Jackson was held in custody solely for trial on these charges, so the State had 90 days after arraignment to bring him to trial. See K.S.A. 22-3402(1). However, after continuances for the court's calendar and the availability of evidence, Jackson's trial date was continued until May 1, 2002. Jackson claims that his trial did not comply with the speedy trial requirements of K.S.A. 22-3402(1).

Jackson raises two arguments in support of this claim. First, he argues the trial court improperly granted two 30-day continuances due to congestion in the court's calendar. Second, he argues the State failed to make a sufficient showing of materiality or reasonable efforts to support a 90-day continuance to secure evidence. An appellate court reviews the application of the speedy trial stat-

ute as a question of law using a de novo standard of review. *State v. White*, 275 Kan. 580, 598, 67 P.3d 138 (2003).

K.S.A. 22-3402(1), in applicable part, provides:

"If any person charged with a crime and held in jail solely by reason thereof shall not be brought to trial within ninety (90) days after such person's arraignment on the charge, such person shall be entitled to be discharged from further liability to be tried for the crime charged, unless the delay shall happen as a result of the application or fault of the defendant, or a continuance shall be ordered by the court under subsection (3)."

K.S.A. 22-3402(3)(d) allows the trial court to continue a trial without violating the defendant's statutory speedy trial right if "[b]ecause of other cases pending for trial, the court does not have sufficient time to commence the trial of the case within the time fixed for trial by this section." The trial court may only continue the defendant's trial one time for no more than 30 days based on this exception to the speedy trial rule. K.S.A. 22-3402(3)(d).

The trial court in this case issued a 30-day continuance pursuant to K.S.A. 22-3402(3)(d) on April 1, 2002, because the trial of Combs, Jackson's codefendant, extended beyond the time previously allotted by the court. Although Jackson did not object to this continuance, he claims that the continuance on April 1 was the second 30-day continuance pursuant to K.S.A. 22-3402(3)(d), in violation of the statute. To support this claim, he points to a note on the trial judge's criminal docket notice of scheduled trials, dated November 28, 2001, stating: "It is expected that Jackson will be severed from the co-defendants set on 1-7, but will not waive speedy trial. Thus I am giving this setting for the *expected* 30-day continuance." (Emphasis added.)

On December 4, 2001, the State moved to sever Jackson's trial from Combs' trial. On December 28, 2001, the trial court granted the State's motion to sever; however, it did not set a new trial date for Jackson. The State moved for a 90-day evidentiary continuance on December 31, 2001. The trial court granted the State's motion for a continuance on January 2, 2002, and set Jackson's trial for April 1, 2002. The record does not contain an order continuing Jackson's trial from January 7, 2002, until January 28, 2002, as the court anticipated on November 28. Jackson cites no authority to

support his contention that the note on the court's November 28 docket notice was the equivalent of a court order for a continuance. Because the court's anticipatory note does not amount to a court order, the trial court did not erroneously grant two 30-day continuances in violation of K.S.A. 22-3402(3)(d).

For his second argument, Jackson asserts that the State failed to meet the statutory standard for a 90-day evidentiary continuance to complete the DNA testing. The State requested a continuance to complete the processing of DNA evidence from the multiple crime scenes. Pursuant to K.S.A. 22-3402(3)(c), the trial court may grant a continuance without violating the speedy trial rule when

"[t]here is material evidence which is unavailable; that reasonable efforts have been made to procure such evidence; and that there are reasonable grounds to believe that such evidence can be obtained and trial commenced within the next succeeding ninety (90) days. Not more than one continuance may be granted the state on this ground, unless for good cause shown, where the original continuance was for less than ninety (90) days, and the trial is commenced within one hundred twenty (120) days from the original trial date."

We have previously upheld continuances of up to 120 days for DNA testing in murder cases without specifically analyzing whether the DNA evidence was material. See *State v. Green*, 254 Kan. 669, 672-73, 867 P.2d 366 (1994); *State v. Green*, 252 Kan. 548, 551, 847 P.2d 1208 (1993) (codefendant brother to prior *Green* case, 112-day continuance). Nevertheless, Jackson argues that the DNA evidence was not material because he did not contest the identity of the victim, the location of the murder, the cause of death, or the identity of the murderer. However, contrary to Jackson's argument, these issues were material because the State prosecuted Jackson as an aider and abettor. In order to establish Jackson's guilt, the State had to prove that a crime was committed by Jackson's codefendants. The DNA evidence established that Williams' blood was on Combs' clothing and the knife found in Combs' possession. Even though the DNA evidence did not directly implicate Jackson, it implicated his codefendants and corroborated Clanton's testimony.

Jackson further argues that the State failed to use reasonable efforts to procure the DNA evidence. The DNA evidence was in-

itially collected in June 2001 by Kansas City, Missouri, crime scene investigators and submitted to the Kansas City, Missouri, crime lab. Due to a backlog of 2,000 homicide cases, including 119 cases that required DNA testing, the DNA evidence for Jackson's case was not available in January 2002 for his original trial date. The prosecutor began contacting Kansas City, Missouri, prosecutors and crime lab personnel about processing the evidence on June 6, 2001, 2 days after Williams was murdered. The prosecutor continued her efforts to procure the evidence by sending letters and making multiple phone calls to crime lab personnel. On December 28, 2001, the prosecutor was informed that regardless of the letters and telephone calls, the evidence could not be processed any faster because of the large backlog and insufficient resources.

Jackson argues that the State should have transferred the evidence to the Kansas Bureau of Investigation or another lab to expedite the testing. However, the State advised the trial court that the KBI had a backlog as well and had been forced to close its lab for 2 weeks because of facility problems, further aggravating the KBI's existing backlog. The State argues that it could not have had the evidence processed any faster at another lab and that transferring a large amount of evidence would have raised numerous issues regarding the chain of custody.

We hold that the State's efforts to procure the DNA evidence for trial were reasonable. Although the State can inform crime labs of trial deadlines and encourage them to process evidence as quickly as possible, it cannot control the crime labs' schedules or case loads. In this case, the State informed and encouraged the crime lab at reasonable opportunities, beginning immediately after Williams' body was found, to expedite the evidence testing. The State is not responsible for the other 119 backlogged cases that required DNA testing. Likewise, the State is not responsible for the resource scheduling at the crime lab.

Jackson has failed to demonstrate any error in commencing his trial. The trial court only issued one order for a 30-day continuance due to the congestion in the court's calendar and that continuance complied with K.S.A. 22-3402(3)(d). Additionally, the State's request for an evidentiary continuance complied with K.S.A. 22-

3402(3)(c). The trial court did not violate Jackson's statutory right to a speedy trial.

## JURY INSTRUCTIONS

Jackson raises several arguments regarding the trial court's jury instructions. First, he argues that the trial court failed to instruct the jury regarding his defenses of withdrawal and compulsion. Second, Jackson asserts that the trial court improperly expanded the instruction for aiding and abetting. Next, Jackson contests the jury instruction about jurisdiction in Kansas. Finally, Jackson argues the trial court should have instructed the jury on felony murder as a lesser included crime of first-degree premeditated murder.

### Defenses of Withdrawal and Compulsion

Jackson contends he acted under duress and withdrew from the criminal enterprise before Combs and Clanton drove to Kansas and murdered Williams. Because he relied on the defenses of compulsion and withdrawal, Jackson asserts the trial court should have instructed the jury as to these defenses as he requested.

A trial court is required to instruct the jury regarding the law applicable to the defendant's theory when there is evidence to support the theory, even if the evidence is slight and supported only by the defendant's own testimony. An appellate court must review the evidence in a light most favorable to the defendant if he or she requests the instruction. *State v. Scott*, 250 Kan. 350, 357, 827 P.2d 733 (1992).

Jackson first argues that under the facts, he was entitled to a jury instruction on his withdrawal defense. He limits his argument for the withdrawal instruction to the murder charge. However, if this court were to agree with Jackson's argument, it would require us to abrogate the current law regarding the defense of withdrawal.

The State prosecuted Jackson as an aider and abettor to murder. Kansas does not recognize the defense of withdrawal from aiding and abetting. *State v. Kaiser*, 260 Kan. 235, 248-49, 918 P.2d 629 (1996). Although Jackson asks us to overturn *Kaiser*, he fails to argue any reason for reversing that decision. We have reaffirmed *Kaiser* in *State v. Speed*, 265 Kan. 26, 52, 961 P.2d 13 (1998), and

*State v. Straughter*, 261 Kan. 481, 482, 932 P.2d 387 (1997), and find no reason to overturn it now. The defense of withdrawal is not available to Jackson as an aider and abettor; thus, the trial court did not err when it refused to instruct the jury on the defense of withdrawal.

Jackson also argues that he was compelled to beat and strangle Williams because he was afraid of Combs. The defense of compulsion is defined by K.S.A. 21-3209, which provides:

"(1) A person is not guilty of a crime other than murder or voluntary manslaughter by reason of conduct which he performs under the compulsion or threat of the imminent infliction of death or great bodily harm, if he reasonably believes that death or great bodily harm will be inflicted upon him or upon his spouse, parent, child, brother or sister if he does not perform such conduct.

"(2) The defense provided by this section is not available to one who willfully or wantonly places himself in a situation in which it is probable that he will be subjected to compulsion or threat."

Although K.S.A. 21-3209(a) precludes the application of compulsion to murder or voluntary manslaughter, Jackson argues the instruction applies to the kidnapping and conspiracy charges and to attempted murder as a lesser included crime of murder. The defense of compulsion requires coercion or duress to be present, imminent, impending, and continuous. It may not be invoked when the defendant had a reasonable opportunity to escape or avoid the criminal act without undue exposure to death or serious bodily harm. *State v. Matson*, 260 Kan. 366, 385, 921 P.2d 790 (1996).

In *State v. Myers*, 233 Kan. 611, 615-16, 664 P.2d 834 (1983), this court concluded that compulsion was not available as a defense because the defendant had opportunities to escape from his codefendant and did not contact the authorities to report the crimes. We can apply the same analysis to this case. Jackson had two opportunities to escape from Combs, once when Jackson and Clanton drove Williams' cousin home and again when Jackson went to the convenience store alone for soda and cigarettes. Jackson did not use either of these opportunities to flee from Combs. In addition, Jackson did not alert law enforcement at any time. Because Jackson had a reasonable opportunity to escape and avoid any criminal acts with Combs and Clanton and to summon law enforcement, he

cannot invoke the compulsion defense. The trial court did not erroneously deny Jackson's request for the instruction.

## Aiding and Abetting Instruction

Jackson argues the trial court erroneously expanded on the PIK Crim. 3d 54.05 and 54.06 instructions for aiding and abetting, see K.S.A. 21-3205, by adding language to read as follows:

"Instruction No. 9

"A person who, either before or during its commission, intentionally aids, abets, advises, hires, counsels, or procures another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime.

"In addition, a person is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by such person as a probable consequence of committing or attempting to commit the crime intended.

"*All participants in a crime are equally guilty without regard to the extent of their participation. However, mere association with the principals who actually commit the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider or abettor. To be guilty of aiding and abetting in the commission of a crime the defendant must willfully and knowingly associate himself with the unlawful venture and willfully participate in it as he would in something he wishes to bring about or to make succeed.*" (Emphasis added.)

An appellate court must consider all of the instructions together, read as a whole. "If the instructions properly and fairly state the law as applied to the facts of the case and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous. [Citation omitted.]" *State v. Cordray*, 277 Kan. 43, 48, 82 P.3d 503 (2004). Trial courts should use the pattern jury instruction unless the facts of a particular case are unique and require modifying the pattern instruction. If the facts are unique, the court should not hesitate to add language or otherwise modify the pattern instruction. *State v. Walker*, 276 Kan. 939, Syl. ¶ 7, 80 P.3d 1132 (2003).

Jackson admits that the facts in this case are unique and the instruction did fairly and properly state the law. But, he argues that there was no evidence to support a finding of mere presence or mere association. He further argues the instruction misled the jury

toward conviction because it precluded the jury from considering his dissociation from Clanton and Combs.

We find no merit in Jackson's argument. Withdrawal was not available as a defense to Jackson. Because Jackson's withdrawal theory was invalid as a matter of law, the court did not err in the language of the instruction.

## Kansas Jurisdiction

Next, Jackson asserts the trial court improperly instructed the jury regarding the jurisdiction of Kansas to prosecute him. The trial court gave the following instructions for Kansas jurisdiction:

"Instruction No. 19

"The place where the conspiracy was formed is immaterial if at least one of the overt acts alleged and proved took place within the State where the defendant is tried."

"Instruction No. 20

"A person is subject to prosecution and punishment under the law of this state if he commits a crime wholly or partly within this state.

"An offense is committed partly within this state if either an act which is a constituent and material element of the offense, or the proximate result of such act, occurs within the state. If the body of a homicide victim is found within the state, the death is presumed to have occurred within the state.

"It is not a defense that the defendant's conduct is also a crime under the laws of another state or of the United States or of another country."

Jackson's argument as to these instructions is the same argument he raised earlier when he claimed that Kansas did not have jurisdiction to prosecute him because he did not enter into or commit any acts in Kansas. Jurisdiction is a question of law to be decided by the court, not the jury. See *State v. James*, 276 Kan. 737, 744-45, 79 P.3d 169 (2003). We have already resolved the issue of jurisdiction against Jackson. We find no merit in his argument that the jury instructions misled the jury regarding the criminal jurisdiction of Kansas under K.S.A. 21-3104.

## Felony-Murder Instruction

Finally, Jackson argues the trial court should have instructed the jury on felony murder and attempted murder as lesser included offenses to first-degree, premeditated murder. Jackson requested

the instructions, so we must analyze this issue in a light most favorable to Jackson. See *Scott*, 250 Kan. at 358.

"A criminal defendant has a right to an instruction on all lesser included offenses supported by the evidence at trial so long as (1) the evidence, when viewed in the light most favorable to the defendant's theory, would justify a jury verdict in accord with the defendant's theory and (2) the evidence at trial did not exclude a theory of guilt on the lesser offense. [Citation omitted.]" *State v. Williams*, 268 Kan. 1, 15, 988 P.2d 722 (1999).

K.S.A. 2003 Supp. 21-3107(2) defines a lesser included offense as

"(a) A lesser degree of the same crime;
"(b) a crime where all elements of the lesser crime are identical to some of the elements of the crime charged;
"(c) an attempt to commit the crime charged; or
"(d) an attempt to commit a crime defined under subsection (2)(a) or (2)(b)."

Felony murder and first-degree premeditated murder are both defined by K.S.A. 21-3401. Proof of felony murder requires proof of all of the same elements as premeditated murder, so it is not a lesser included offense pursuant to K.S.A. 2003 Supp. 21-3107(2)(b). See *State v. Young*, 277 Kan. 588, 593-94, 87 P.3d 308 (2004) (noting that felony murder and premeditated murder define the same crime of first-degree murder). Jackson argues that felony murder is a lesser included offense because it carries less mandatory prison time than premeditated murder. However, the statute does not define lesser included offenses by the sentence imposed. Because felony murder is not a lesser included offense of first-degree premeditated murder, the trial court did not err when it denied Jackson's request for a felony-murder instruction.

Conversely, attempted murder is a lesser included offense pursuant to K.S.A. 2003 Supp. 21-3107(2)(c), so the trial court was required to give that instruction if there was evidence to support it. See *State v. Robinson*, 261 Kan. 865, 883, 934 P.2d 38 (1997). Jackson does not dispute that Williams died in Kansas after being run over by Combs and Clanton. Rather, he argues that he did not participate in the killing because he withdrew prior to the actual murder. As previously stated, Jackson cannot use the defense of withdrawal because he was tried under an aiding or abetting the-

ory. Therefore, this issue is without merit. There is no evidence to support a finding that Jackson, Combs, and Clanton attempted but were unsuccessful in murdering Williams. The trial court did not err when it refused to give an instruction on attempted murder.

## ADMISSION OF EVIDENCE

Jackson raises three issues regarding the admission of evidence. First, Jackson argues the trial court erroneously admitted gruesome photographs. Next, Jackson argues the trial court erroneously admitted hearsay statements made by Combs. Finally, Jackson argues the trial court erroneously admitted his confession.

### Gruesome Photographs

Jackson claims the trial court erroneously admitted gruesome photographs and a videotape of the crime scene. Jackson argues he did not dispute Williams' death or the manner in which Combs and Clanton killed her, so the visual images were irrelevant.

The trial court has wide discretion for admitting photographs in a murder case. The trial court's decision to admit gruesome photographs will not be reversed on appeal unless the defendant demonstrates that the trial court abused its discretion. *State v. Pennington*, 276 Kan. 841, 848, 80 P.3d 44 (2003).

Relevant evidence is any "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). Relevancy is determined as a matter of logic and experience rather than as a matter of law, but there must be some material or logical connection between collateral facts and the inference or result they are supposed to establish. 276 Kan. at 847.

Jackson's argument overlooks the State's theory that Jackson was guilty as an aider and abettor rather than as a principal in Williams' murder. Because the State proceeded under an aiding and abetting theory, it was essential to its burden of proof that it establish the actions of the principals, Combs and Clanton. The photographs were relevant to establish the nature of the injuries inflicted on Williams and to explain the cause of her death. Accordingly, the trial court did not err by admitting the photographs and the crime scene videotape into evidence.

## Hearsay Statements

Next, Jackson claims the trial court improperly admitted hearsay statements from Combs. Although Combs did not testify, Clanton testified she overheard Combs talking to Jackson on the telephone. Although she could not hear what Jackson was saying, she testified, over Jackson's objection, that Combs asked Jackson "what he would do or how would he go about killing somebody." Clanton admitted Combs told her he was talking to Jackson, but she could not be certain who was on the other end of the conversation because she did not hear the other person.

Jackson requests a de novo standard of review, citing *State v. Deines*, 268 Kan. 432, 434, 997 P.2d 705 (2000). However, *Deines* does not address the admissibility of hearsay or any other evidence and does not properly state the standard of review for this issue.

We have recently clarified our standard of review in *State v. Elnicki*, 279 Kan. 47, 51, 105 P.3d 1222 (2005), and *State v. Carter*, 278 Kan. 74, 77, 91 P.3d 1162 (2004). In *Carter*, we said:

"An appellate court's first consideration when examining a challenge to a district court's admission of evidence is relevance. Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question." 278 Kan. 74, Syl. ¶ 1.

Jackson does not contest the relevance of Combs' statements. We thus proceed to the application of the evidentiary rules.

The State argues that Combs' statements are admissible pursuant to K.S.A. 2003 Supp. 60-460, which provides in pertinent part:

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except:

. . . .

"(i) *Vicarious admissions.* As against a party, a statement which would be admissible if made by the declarant at the hearing if . . . (2) the party and the declarant were participating in a plan to commit a crime or a civil wrong and the statement was relevant to the plan or its subject matter and was made while the plan was in existence and before its complete execution or other termination."

Jackson raises two arguments regarding the admission of Combs' statements. First, Jackson contends the conspiracy exception does

not apply because Combs' statements were made before Jackson entered into the conspiracy. Combs' question about how to kill someone was a general question rather than a specific request for Jackson to join him in killing Williams. Second, Jackson argues that Clanton's testimony lacked sufficient indicia of reliability.

Jackson's argument that the conspiracy or coconspirator exception does not apply is not supported by the evidence. Clanton's testimony supports the conclusion that Jackson was involved in the conspiracy during the telephone call with Combs. A conspiracy may be inferred from sufficiently significant circumstances. See *State v. Swafford*, 257 Kan. 1023, 1039-40, 897 P.2d 1027 (1995), *modified on other grounds* 257 Kan. 1099, 913 P.2d 196 (1996). Clanton testified that Jackson had a small bottle with a white substance and a syringe already prepared when they arrived at Jackson's apartment a few hours after the phone call. According to Clanton, Jackson told Combs that all he had to do was to "stick her with [the syringe], just stick her with it and she will—once it gets in her system she will—eventually it will eventually eat up her system and she will pass out or she will die." The preparation of the substance and the syringe and the reference to "she" in Jackson's directions infer that Jackson was already part of the plan to kill Williams before Combs and Clanton arrived to pick him up. Jackson's prior involvement can also be inferred by Combs' assumption that Jackson was going with him and Clanton. According to Clanton, Combs asked Jackson, "[Y]ou're not going with us?" Jackson responded, "I'm in for the night, you know, you all waited too late." Jackson's response indicates that he had planned to go with Combs and Clanton but changed his mind because it was late at night. If Combs' question about how to kill someone had been generic, Jackson would not have prepared a syringe, referred to the victim as a "she," or planned to go with Combs and Clanton until it became too late. The record supports the inference that Jackson was part of the conspiracy when Combs asked the question about how to kill someone. The conspiracy or coconspirator exception to the hearsay rule applies.

For his second argument, Jackson asserts that Clanton's testimony lacks adequate indicia of reliability as required by the Con-

frontation Clause of the Sixth Amendment to the United States Constitution. In *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), the United States Supreme Court established a new analysis for Confrontation Clause claims, reevaluating the reliability analysis set forth in *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980). The first step in the *Crawford* analysis is to determine whether a statement is testimonial. Testimonial statements include, at a minimum, "prior testimony at a preliminary hearing, before a grand jury, or at a former trial . . . and to police interrogations." 541 U.S. at 68. If the statement is testimonial, it may only be admitted if the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the declarant. 541 U.S. at 59, 68. If the statement is not testimonial, the *Crawford* Court stated that it is wholly consistent with the Confrontation Clause to analyze the issue based on the applicable hearsay law. 541 U.S. at 68.

The *Crawford* Court specifically noted that statements by coconspirators are not testimonial. 541 U.S. at 56. Therefore, the proper Confrontation Clause analysis requires us to apply Kansas hearsay law. In *Swafford*, this court considered whether a coconspirator's statement bore sufficient indicia of reliability. The *Swafford* court concluded that the coconspirator exception to the hearsay rule found in 60-460(i)(2) is a firmly rooted hearsay exception that infers reliability without requiring further proof. 257 Kan. at 1039-40. The *Crawford* Court did not overturn the firmly rooted hearsay exception analysis for nontestimonial statements. See 541 U.S. at 68. Because of this, *Swafford* is controlling. Combs' statement fits within the coconspirator exception to the hearsay rule. This is a firmly rooted exception. There is no need to establish further indicia of reliability. The trial court did not err by admitting Combs' statement.

## Jackson's Confession

Jackson argues his confession was not voluntary because he was suffering from heroin withdrawal and could not resist the coercive interrogation tactics used by police.

An appellate court reviews the district court's decision regarding the suppression of a confession using a dual standard. The factual findings are reviewed using a substantial competent evidence standard. An appellate court will not reweigh the evidence but will give deference to the trial court's factual findings. The ultimate legal conclusion drawn from the trial court's factual findings is a question of law which is reviewed de novo. *State v. White*, 275 Kan. 580, 596-97, 67 P.3d 138 (2003). An appellate court accepts as true the evidence and all inferences drawn therefrom that support the trial court's findings. *State v. Speed*, 265 Kan. 26, 36-37, 961 P.2d 13 (1998). To determine whether a confession is voluntary, a court must look at the totality of the circumstances in considering the following factors: the duration and manner of the interrogation; the ability of the accused to communicate on request with the outside world; the age, intellect, and background of the accused; and the fairness of the officers in conducting the investigation. The key inquiry is whether the statement is a product of the accused's free and independent will. *White*, 275 Kan. at 597. Coercion in obtaining a confession can be mental or physical.

### Duration and manner of the interrogation

Jackson's interrogation began at approximately 9:30 a.m. A Kansas City, Missouri, police officer began by asking Jackson some biographical information and gave Jackson the *Miranda* warnings at about 9:45 a.m. At 11:28 a.m., Jackson accompanied officers to a different room to videotape his statement, which was completed at 12:13 p.m.

Jackson's interrogation occurred at the Kansas City, Missouri, Police Department in its standard interview rooms. Jackson was not handcuffed during the interrogation. The officers interrogating Jackson gave him a cigarette and allowed him to use the bathroom during the interrogation. Jackson did not request any food or drinks.

An examination of the videotape shows the interview was conducted in a calm, orderly manner. The voices of the officers were not raised. The questions and tactics used were not intimidating.

There is no support for the conclusion that the duration and manner of Jackson's interrogation were coercive.

Jackson also argues that the court must find his confession involuntary because the police only recorded a portion of his interrogation. He fails to cite any case law requiring police to videotape every minute of an accused's interrogation. We decline to make such a holding in this case. The testimony from Jackson and the officer who interrogated Jackson provided a sufficient record for evaluating the duration and manner of Jackson's interrogation. None of this testimony supports the conclusion that the duration and manner of Jackson's questioning coerced Jackson to confess.

### Jackson's ability to communicate on request with the outside world

Jackson did not request to speak to an attorney or anyone else during his interrogation. The record does not support a finding that Jackson's confession was coerced because he was denied contact with anyone outside the interrogation room.

### Jackson's age, intellect, and background

Jackson was 42 years old at the time of his interrogation. He had four prior convictions, three for burglary and one for driving while intoxicated. Jackson argues his confession was coerced because he was suffering from heroin withdrawal during his interrogation. Jackson testified he had consumed a substantial quantity of heroin 5 days before his interrogation and that he suffered from withdrawal symptoms if he did not consume heroin every 2 days. According to Jackson, the symptoms of heroin withdrawal include cold chills, excessive sleep, and lack of appetite. Although Jackson testified he was tired, cold, and nervous during the interrogation, he repeatedly testified he "was not out of it" during his interrogation.

The police officer conducting Jackson's interrogation testified Jackson did not appear to be under the influence of any drugs or alcohol and that Jackson's responses were appropriate. Although Jackson's hair was unkempt, there was no physical indication that he was suffering from heroin withdrawal. Jackson admitted he did

not remember informing the police officers that he was suffering from heroin withdrawal.

The record does not support Jackson's claim that his confession was involuntary because he was suffering from heroin withdrawal. The trial court's decision to admit Jackson's confession implies its finding that Jackson was not influenced by his withdrawal symptoms. This implied finding is supported by the evidence in the record and will not be overturned on appeal. See *Hill v. Farm Bur. Mut. Ins. Co.*, 263 Kan. 703, 706, 952 P.2d 1286 (1998). There is no merit to this contention.

### *Fairness of the officers in conducting the investigation*

Jackson argues that the officers pressured him into confessing and told him what to say. Jackson testified the officers "just kept pushing me, pushing me and forcing me to say—say it this way."

Initially, Jackson denied any involvement in Williams' death. However, after the officer conducting the investigation implied that Combs and Clanton had blamed Jackson for the murder, Jackson's story changed. The officer told Jackson he did not believe it was Jackson's idea to murder Williams and encouraged Jackson to further explain his involvement in Williams' death. The officer admitted the detectives questioning Jackson suggested how the homicide occurred based on the physical evidence at the scene. Jackson testified the officers "were saying that all—all of it was coming on me. I was facing the murder rap by myself and in order for me to clear myself, that I—that I have to tell them the truth . . . ."

In *State v. Kornstett*, 62 Kan. 221, 61 Pac. 805 (1900), the police told the defendant that he would feel better if he told the truth. This court stated that "mere advice or admonition to the defendant to speak the truth, which does not import either a threat or benefit, will not make a following confession incompetent." 62 Kan. at 227. In *State v. Harris*, 279 Kan. 163, 171-72, 105 P.3d 1258 (2005), we upheld the admission of the defendant's confession even though the police told the defendant their theory of the homicide and suggested options for how the murder occurred. Jackson cannot distinguish the police interrogation techniques in this case from those used in *Kornstett* and *Harris*. Furthermore, Jackson has

failed to cite any case law that forbids law enforcement officers from suggesting how the crime occurred based on other evidence within their knowledge. This factor does not weigh in favor of excluding Jackson's confession.

When the totality of the circumstances is considered in light of the four *White* factors, there is no support for Jackson's claim that his confession was coerced based on the failure to videotape all of his interrogation, the effects of his drug withdrawal symptoms, or the police officers' suggestions regarding the manner of Williams' death and their encouragement to tell the truth. The trial court did not err when it admitted Jackson's confession into evidence.

## CUMULATIVE ERRORS

Jackson argues he was denied a fair trial by cumulative errors. We look at the totality of the circumstances to determine whether cumulative errors have substantially prejudiced a defendant and denied his or her right to a fair trial. However, if the evidence is overwhelmingly against the defendant, no prejudicial error may be found on the cumulative effect rule. *State v. Plaskett*, 271 Kan. 995, 1022, 27 P.3d 890 (2001). Applying this standard, we conclude that Jackson has failed to establish any error by the trial court. His claim of cumulative errors must fail.

## SUFFICIENCY OF THE EVIDENCE

When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Hanson*, 277 Kan. 855, 856-57, 89 P.3d 544 (2004).

Jackson raises five arguments in support of his claim that there is insufficient evidence to support his convictions. First, he argues that Clanton's testimony lacks credibility. The jury is responsible for weighing the evidence and passing on the credibility of witnesses. An appellate court does not invade the province of the jury by reweighing the evidence or determining the credibility of the

witnesses. See *State v. James*, 276 Kan. 737, 753, 79 P.3d 169 (2003). This argument is without merit.

For his other four arguments, Jackson reiterates arguments previously raised in this appeal. He argues there is insufficient evidence to show his intent to murder Williams because he acted from compulsion and withdrew before she was murdered. Jackson asserts there is no evidence he entered Kansas or participated in the final act that ended Williams' life. Jackson claims there is insufficient evidence to convict him of kidnapping Williams because he did not help put her in the back of the U-Haul truck and it was not reasonably foreseeable that Combs and Clanton would drive to Kansas with Williams. Each of these arguments have been previously resolved against Jackson. There is no merit to his claim that his convictions are supported by insufficient evidence.

We find no trial errors. We affirm Jackson's convictions for first-degree premeditated murder, kidnapping, and conspiracy to commit murder. With these conclusions reached, we proceed to the sentencing issues.

## HARD 50 SENTENCING SCHEME

Jackson argues that the hard 50 sentencing scheme, K.S.A. 21-4635 *et seq.*, is unconstitutional because it increases the sentencing range by adding 25 years to the defendant's parole ineligibility. The constitutionality of a statute is a question of law over which this court has unlimited review. *State v. Beard*, 274 Kan. 181, 185, 49 P.3d 492 (2002).

Jackson's argument has been previously considered and rejected by this court. See, *e.g.*, *State v. Hebert*, 277 Kan. 61, Syl. ¶ 14, 82 P.3d 470 (2004); *State v. Washington*, 275 Kan. 644, 680, 68 P.3d 134 (2003); *State v. Boldridge*, 274 Kan. 795, 812, 57 P.3d 8 (2002), *cert. denied* 538 U.S. 950 (2003); *State v. Douglas*, 274 Kan. 96, 111, 49 P.3d 446 (2002), *cert. denied* 537 U.S. 1198 (2003); *State v. Conley*, 270 Kan. 18, Syl. ¶ 3, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001) (upholding the hard 40 sentencing statute).

Jackson asks this court to overturn *Conley* and its progeny but fails to cite any additional authority to support the reversal of this court's position. An issue raised but unsupported by any argument

or authority has no persuasive effect. *Conley* and its progeny are controlling. The hard 50 sentencing provisions are constitutional.

## SUFFICIENCY OF THE EVIDENCE TO SUPPORT A HARD 50 SENTENCE

Jackson claims there is insufficient evidence to support the imposition of the hard 50 sentence against him. He raises three arguments to support this claim. First, Jackson argues the trial court relied on acts committed by his codefendants rather than himself and that such reliance violates K.S.A. 2003 Supp. 21-4636(f). Second, Jackson argues his conduct was not especially heinous, atrocious, or cruel. Third, Jackson argues the court relied on inherently unreliable evidence to support its finding that the murder was committed for the purpose of receiving money or any other thing of monetary value.

To address Jackson's first argument, we interpret K.S.A. 2003 Supp. 21-4636(f). The interpretation of a statute is a question of law over which this court has unlimited review. *State v. Maass*, 275 Kan. 328, 330, 64 P.3d 382 (2003).

K.S.A. 2003 Supp. 21-4636 provides in pertinent part:

"Aggravating circumstances shall be limited to the following:

. . . .

"(f) The defendant committed the crime in an especially heinous, atrocious or cruel manner. A finding that the victim was aware of such victim's fate or had conscious pain and suffering as a result of the physical trauma that resulted in the victim's death is not necessary to find that the manner in which the defendant killed the victim was especially heinous, atrocious or cruel. In making a determination that the crime was committed in an especially heinous, atrocious or cruel manner, any of the following conduct by the defendant may be considered sufficient:

. . . .

(3) infliction of mental anguish or physical abuse before the victim's death;

. . . .

(5) continuous acts of violence begun before or continuing after the killing."

Jackson admits Williams' murder was especially heinous, atrocious, or cruel but claims that all of the especially heinous, atrocious, or cruel actions were committed by his codefendants rather than himself. He argues that K.S.A. 2003 Supp. 21-4636(f) requires

the especially heinous, atrocious, or cruel actions be committed by him rather than his codefendants for the aggravating factor to apply. This argument overlooks the evidence in the record.

Clanton testified that Jackson planned to inject Williams with a poison that would "eat up her system." Jackson hit Williams in the head with a mallet so he could inject her with the poison. When Williams screamed, Jackson jumped on top of her and tried to strangle her. Williams struggled with Jackson, and the two fell on the floor. Jackson then fought with Williams for several minutes on the floor, leaving Williams' blood splattered across her bed, her floor, her walls, and other articles in her room. After quieting Williams, Jackson sat on top of her and told Combs to get the syringe with the poison. When Jackson broke the syringe, he and Combs started looking for an extension cord to use to strangle Williams. Combs found an extension cord and handed it to Jackson, but Jackson broke the extension cord before he could strangle Williams to death. At that point, Combs suggested that Jackson stab Williams. Jackson told Combs to stab her himself because he was tired.

All of Jackson's actions in beating, strangling, and fighting with Williams prior to her death inflicted mental anguish or physical abuse and constituted continuous acts of violence begun before the victim's death as articulated by K.S.A. 2003 Supp. 21-4636(f)(3) and (5). Jackson's argument that the trial court improperly applied the statute to him based on the actions of his codefendants is without merit.

Likewise, Jackson's argument that his actions were not especially heinous, atrocious, or cruel is without merit. When reviewing a challenge to the sufficiency of the evidence for establishing the existence of an aggravating circumstance in a hard 50 sentencing proceeding, the court must determine " 'whether, after a review of all the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating circumstance by a preponderance of the evidence.' [Citations omitted.]" *Boldridge*, 274 Kan. at 808.

Jackson argues that he tried to help Williams. The only evidence that Jackson attempted to help Williams came from his own statement. Jackson said that he told Williams to play like she was dead

and that he would call the ambulance. However, Jackson never called an ambulance or alerted police.

In reviewing the evidence as required by *Boldridge*, Clanton's testimony supports the finding that Jackson's actions inflicted both mental anguish and physical abuse constituting continuous acts of violence against Williams. Jackson was directly responsible for leaving her in a condition that made it easier for Combs and Clanton to run over her with the U-Haul. Jackson's actions clearly fall within the definition of especially heinous, atrocious, or cruel found in K.S.A. 2003 Supp. 21-4636(f)(3) and (5).

Jackson's argument that the trial court relied on inherently unreliable evidence for its finding that the murder was committed for the purpose of receiving money or any other thing of monetary value also fails. This is another attempt to discredit Clanton's testimony. However, the jury's verdict demonstrates it found Clanton to be a credible witness. We do not reweigh the evidence or pass on the credibility of witnesses. *State v. Moore*, 269 Kan. 27, 30, 4 P.3d 1141 (2000).

Jackson's argument also overlooks the standard of review set forth previously. Clanton testified that Jackson helped load Williams' property into the U-Haul and took a small television with him when he returned to his apartment. This evidence supports the trial court's finding that Jackson committed the crime for the purpose of receiving money or other things of monetary value.

The trial court's findings regarding the aggravating circumstances are supported by the record. Jackson does not argue that the district court improperly weighed these factors against the mitigating factors. K.S.A. 2003 Supp. 21-4635(c) requires the district court to impose a hard 50 sentence if it concludes that the aggravated circumstances outweigh any mitigating circumstances. The trial court did not err when it sentenced Jackson to a hard 50 life sentence.

We have considered all of the arguments and find no error. The convictions and sentences are affirmed.

GERNON, J., not participating.

LARSON, S.J., assigned ▌