NOT DESIGNATED FOR PUBLICATION

No. 124,676

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

G.O.,
*Appellee*.


MEMORANDUM OPINION


Appeal from Shawnee District Court; NANCY E. PARRISH, judge. Opinion filed September 23, 2022. Reversed and remanded.

*Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellant.

*Reid T. Nelson*, of Capital and Conflicts Appeals Office, for appellee.


Before HURST, P.J., BRUNS and GARDNER, JJ.


PER CURIAM: This case comes before the court on the State's interlocutory appeal, challenging the district court's decision to suppress G.O.'s confession to having sexually abused his stepsister. As the district court noted, the determination whether G.O.'s confession was voluntary is a close question. But having examined the totality of the circumstances and finding no coercion by the police officer, we reverse.

*Initiation of Police Investigation and DCF Involvement.*

In 2017, G.O.'s stepsister reported allegations of sexual abuse by G.O., which had occurred over years. Stepsister initially disclosed the abuse to the KVC Kansas Health Facility, which referred the matter to the Kansas Department for Children and Families (DCF). KVC and DCF then separately contacted G.O.'s mother to discuss the matter.

DCF told Mother that she needed to remove G.O. from the family's home before Stepsister returned from KVC, and Mother did so. DCF set a goal of reintegration for the family, and later met with Mother, Stepsister, and G.O.'s stepfather for weekly counseling sessions. DCF also told Mother that the family "needed to be interviewed" and that someone would be reaching out to her to set that up.

Sergeant Ryan Hayden contacted Mother and eventually interviewed each family member separately. Based on her conversations with DCF, Mother believed that these interviews were required, so she told G.O. he had to meet with Hayden.

*Hayden's 2017 Interview with G.O.*

After discussing a plan with Hayden, Mother drove G.O. to the police station for his interview. Once there, Mother asked if she could sit in on the interview, but Hayden told her she should wait in the lobby. He then took G.O. to a separate room.

While walking into the interview room, Hayden asked G.O. if he needed a restroom break or a drink; G.O. declined both. Hayden stated that he hoped the interview would not take very long and told G.O. he would get him back to school when the interview was finished. Hayden introduced himself as "Detective Hayden," and explained that he had been a police officer for around 15 years and that he worked with children, but typically worked with "young young kids."

2

Hayden assured G.O.: "You are not under arrest. You're not going to be under arrest when we're done." G.O. agreed that his Mother had told him so and confirmed that he knew he would not be arrested. Hayden then suggested that G.O. was summoned to the police station to "get some stuff cleared up." Hayden also stated that he was "just trying to clear some things up for [G.O.] and [his] sister," but "especially [his] sister" because she "was kinda hurting" at that time. Hayden suggested that if they could get things cleared up, it would help everyone out. He explained that "this [was not] about getting people in trouble, [it was] about trying to fix some things . . . [s]o [they could] all move on." Hayden made similar statements about the need to help Stepsister at other times during the interview.

Hayden then repeated that G.O. was not under arrest and would not be under arrest when they were done. Yet he noted that they were sitting in an interrogation room, he read G.O. his *Miranda* warnings, and he asked if G.O. understood his rights. G.O. responded that he did.

G.O. answered a few questions about himself, explaining he was in the 11th grade, had good grades, played the violin, enjoyed technology, and wanted to attend Washburn University. G.O. also acknowledged that Stepsister was hurting "big time" and told Hayden that he wanted her to get better.

Without any prompting or question by Hayden, G.O. then started discussing the topic of sexual abuse. He stated that he lived in the basement, that Stepsister would come downstairs, that she had issues with Mother, and that he was just trying to make things better, but it "went downhill." He admitted to sexually abusing Stepsister and suggesting that his actions may have stemmed from his past, saying he had been abused when young by his babysitter's son. G.O. explained that his abuser would take him to a bedroom, lock the door, and then force him to engage in various sex acts.

3

Before asking G.O. for details, Hayden assured G.O. that he could speak freely when discussing the sexual abuse that he had committed. Hayden told G.O. that any information he was likely to relay was not going to be new or shocking to him. At the same time, however, Hayden warned G.O. that the nature of their interview could change if G.O. lied or failed to provide pertinent information. Hayden told G.O. that he would no longer have "control" over what may happen if G.O. failed to tell the truth. Hayden told G.O. that Mother had told him that G.O. wanted to get things off his chest.

G.O. gave detailed descriptions of several instances in which he sexually abused Stepsister. G.O. told Hayden that he understood Stepsister was probably not a willing participant when the abuse first started. G.O. also acknowledged that he probably persuaded Stepsister to do what he wanted, and she may have gotten used to it as time progressed. G.O. also claimed that if Stepsister asked to him to stop mid act, he complied. G.O. also claimed that he had not engaged in any sexual behavior with Stepsister for the most recent two years, and Stepsister had instigated the final incident.

When Hayden asked G.O. whether he had threatened Stepsister, he responded that he was pretty sure he had not, unless he forgot it. But G.O. then admitted he had probably threatened her near the beginning because he did not want her to tell. He added that if Stepsister said something happened, she was probably "right." G.O. also told Hayden that if he had threatened Stepsister, he never intended to harm her and felt "terrible" about what he had done.

Hayden also asked G.O. about Stepsister's relationship with Mother and his relationship with Stepfather. This resulted in another lengthy response from G.O. He noted that Stepsister had previously accused Mother of physical abuse, but he said no such abuse occurred. G.O. described his relationship with Stepfather as being "very awkward" after Stepsister's allegations arose. But G.O. noted that he had been removed from the house and was thus not interacting with Stepfather much. G.O. then stated that

4

all he wanted to do was to "go home" and to get everything "done and over with" and "cleared up." G.O. then volunteered that he had locked himself in a closet, had many anxiety and panic attacks, that he takes medication to deal with his anxiety issues, and that he is in therapy at DCF bi-weekly. Hayden acknowledged these statements before redirecting the conversation to additional details of the alleged abuse.

Before ending the interview, Hayden asked G.O. whether they had missed anything. G.O. thought that they had covered everything but asked if Stepsister had talked about anything else. Hayden then asked G.O. whether he wanted to write Stepsister a note. G.O. responded with a third lengthy discourse, talking about his "very large-scale anxiety attack," after his acts with Stepsister were revealed. Apparently when he locked himself in the closet, he wrote a note to Stepsister and notes to Mother and Stepfather and pushed them under the door to Mother. To Stepsister, he wrote that he was sorry and she did not deserve what happened to her. To the others, he wrote that he had not wanted them to find out, but he had tried to help Stepsister to make it better. He did not write details and was unsure whether Mother knew he had had sex with Stepsister.

Hayden then asked again if G.O. wanted to write notes today, and G.O. decided not to. G.O. gave Hayden permission to get his previous notes from Mother and said that he might write another note in the future. Hayden left G.O. alone in the interview room, asked Mother about the apology letter, then returned to the interview a few minutes later and escorted G.O. back to the lobby. Hayden did not arrest G.O. that day. In fact, no one arrested him until over two years later.

*Initiation of a Criminal Case and Plea Negotiations*

The State charged G.O. in August 2019 with one count of aggravated criminal sodomy and one count of aggravated indecent liberties with a child. The district court allowed the State to prosecute G.O. as an adult. G.O. later pleaded guilty to criminal

5

sodomy, and the State dismissed the remaining count of aggravated indecent liberties with a child. The parties agreed to leave G.O.'s recommended sentence open for arguments.

But before sentencing, G.O. moved for a downward dispositional departure. And soon after, G.O. moved to withdraw his plea, arguing defense counsel had incorrectly told him that he could request a dispositional departure sentence despite K.S.A. 2021 Supp. 21-6818(a)'s prohibition of such a request. G.O. also moved to withdraw his waiver of his preliminary hearing. The district court granted G.O.'s motion, withdrew his plea, and set the case for pretrial.

As pretrial progressed, the State filed an amended and second amended complaint. The State charged G.O. with 60 offenses, including multiple counts of aggravated criminal sodomy, rape, attempted rape, and aggravated indecent liberties with a child. The complaint alleged that G.O. had committed these offenses over a 4-year span when he was under 18 and Stepsister was under 14 years old.

*Suppression Proceedings*

G.O. moved to suppress his incriminating statements, arguing he made them involuntarily in reaction to Hayden's coercive conduct.

At the suppression hearing, the State admitted testimony from Hayden and the video of his interview with G.O. Hayden testified, and the video confirms, that the overall nature of the interview was relaxed and Hayden's tone was cordial. G.O. came and left with his Mother, who stayed in the police station lobby during the interview. She had told Hayden that G.O. wanted to get something off his chest. Hayden gave *Miranda* warnings to G.O. and G.O. said he understood them. G.O. never invoked his right to stop questioning or to have a lawyer present. The interview of G.O. lasted around 50 minutes,

6

and they did not take any breaks. Hayden was the only officer in the room; he had his firearm but never drew it. G.O. seemed to understand Hayden's questions and gave appropriate responses. G.O. did not appear to be under the influence of any drugs or alcohol.

G.O. called Mother as his only witness at the suppression hearing. She testified that G.O. was 16 years old when he was interviewed and was less mature than his peers. He had a mild learning disability but was likely to graduate on time because he was in the alternate education program then and getting good grades. G.O. had played the violin from 4th grade through his senior year. She considered him "not college material," and discounted his college plans. G.O. had never been arrested and had no prior interactions with police. He had been diagnosed with anxiety, depression, and attention deficit disorder, and was taking medications for at least one of those disorders when interviewed.

In his closing argument, G.O. claimed that his mental state, age, intellect, and background—including his lack of interactions with police and his history of sexual abuse—affected his ability to make a voluntary confession. G.O. argued that Hayden gave inadequate *Miranda* warnings because he did not explain the warnings or ask G.O. whether he wished to waive his rights and speak to him. And Hayden should have asked G.O. about his state of mind or medications that day. He also argued that Hayden's repeated statements that he would not be arrested amounted to an improper promise that Hayden should have known would induce an involuntary confession from an inexperienced 16-year-old.

*District Court Decision and Interlocutory Appeal*

The district court found G.O.'s motion raised "a very close question" but after considering the evidence, determined that G.O.'s statements were involuntary and thus

7

inadmissible. The district court found that G.O.'s mental condition, lack of experience with police, and understanding that the interview would be used only to help Stepsister warranted suppression.

The district court also acknowledged G.O.'s additional request to suppress the apology notes G.O. had written and that Mother had delivered to Hayden—which G.O. added to his motion the day of the suppression hearing. But the court did not rule on that matter to allow the State time to file a response.

The State filed a timely interlocutory appeal from the district court's suppression order, as allowed under K.S.A. 2021 Supp. 22-3603.

*Did the District Court Err in Granting G.O.'s Motion to Suppress His Incriminating Statements?*

When a defendant moves to suppress incriminating statements as involuntary, the State bears the burden to show by a preponderance of the evidence that the statements were freely and voluntarily given. We determine the voluntariness of a confession by looking at the totality of the circumstances. *State v. Johnson*, 286 Kan. 824, 836, 190 P.3d 207 (2008).

An individual's statement to government agents is involuntary if it is the product of impermissible coercion negating that person's free will. See *State v. Gilliland*, 294 Kan. 519, Syl. ¶¶ 3, 4, 276 P.3d 165 (2012); *State v. Stone*, 291 Kan. 13, 21, 237 P.3d 1229 (2010). Application of the exclusionary rule depends on whether "[t]he line between proper and permissible police conduct and techniques and methods offensive to due process" has been crossed. *Haynes v. Washington*, 373 U.S. 503, 515, 83 S. Ct. 1336, 10 L. Ed. 2d 513 (1963). As the United States Supreme Court clarified in *Colorado v. Connelly*, 479 U.S. 157, 164, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986), "police

8

overreaching" is an "integral element" to finding a confession involuntary under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The Supreme Court has never repudiated or limited its holding in *Connelly*, nor is that holding an outlier. In discussing the test for whether a confession has been coerced in violation of a suspect's due-process rights, the Court has pointed to "the crucial element of police coercion." *Withrow v. Williams*, 507 U.S. 680, 693, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993).

Our appellate courts have recognized *Connelly* as controlling precedent and have found coercion is necessary to find a confession involuntary. See, e.g., *State v. Barrett*, 309 Kan. 1029, 1044, 442 P.3d 492 (2019); *State v. Kirkland*, No. 122,971, 2022 WL 68579, at *10 (Kan. App. 2022) (unpublished opinion). "Coercion in obtaining a confession can be mental or physical." *State v. Jackson*, 280 Kan. 16, 36, 118 P.3d 1238 (2005). A government agent may induce an involuntary statement through improper threats of harm, promises of benefit, a combination of the two, or other undue influence over the individual. *Hutto v. Ross*, 429 U.S. 28, 30, 97 S. Ct. 202, 50 L. Ed. 2d 194 (1976); *State v. Brown*, 286 Kan. 170, 174, 182 P.3d 1205 (2008).

When deciding whether to suppress, trial courts consider the totality of the circumstances and the following nonexclusive factors: (1) defendant's mental condition; (2) the interview's manner and duration; (3) defendant's ability to communicate on request with the outside world; (4) defendant's age, intellect, and background; (5) the officer's fairness in conducting the interview; and (6) defendant's fluency with the English language. *State v. Vonachen*, 312 Kan. 451, 464, 476 P.3d 774 (2020).

In addition, our caselaw "recognizes a heightened sensitivity when the accused is a juvenile." *State v. Gibson*, 299 Kan. 207, 215, 322 P.3d 389 (2014). "A juvenile's inculpatory statement must be voluntary and free from coercion or suggestion and must not be the product of ignorance of rights or adolescent fantasy, fright, or despair." 299

Kan. at 215. Courts must therefore exercise "the greatest care" in assessing the validity of a juvenile's confession or statement to law enforcement officers. See *State v. Mays*, 277 Kan. 359, 373, 85 P.3d 1208 (2004); *State v. R.W.*, 58 Kan. App. 2d 135, 144, 464 P.3d 27, *rev. denied* 312 Kan. 899 (2020).

When, as here, the accused is a juvenile, the trial court should consider the following nonexclusive factors—commonly referred to as the *Young* factors—in addition to those considered in the adult context: (1) the juvenile's age; (2) the length of questioning; (3) the juvenile's education; (4) the juvenile's prior experience with law enforcement officers; and (5) the juvenile's mental state. *R.W.*, 58 Kan. App. 2d at 145. See *State v. Young*, 220 Kan. 541, 546-68, 552 P.2d 905 (1976). These factors largely highlight certain factors we traditionally examine in the adult context. See *Gibson*, 299 Kan. at 215 (recognizing an overlap between some of the factors applied in the adult and juvenile contexts).

When reviewing a district court's decision on a motion to suppress, appellate courts review the factual underpinnings of the decision for substantial competent evidence and review the district court's ultimate legal conclusion de novo. This court does not reweigh evidence, assess witness credibility, or resolve conflicting evidence. *Vonachen*, 312 Kan. at 463-64. "An appellate court accepts as true the evidence and all inferences drawn therefrom that support the trial court's findings. The key inquiry is whether the statement is a product of the accused's free and independent will." *Jackson*, 280 Kan. at 36.

*The District Court's Factual Findings*

The district court properly enumerated the factors from our caselaw that weigh in the balance when deciding whether a statement is voluntary. When considering the evidence in favor of finding G.O.'s statements voluntary, the district court recognized:

10

- G.O.'s interview lasted less than an hour;
- G.O. was just three months shy of turning 17 years old;
- G.O. exhibited a good vocabulary throughout the interview, using words like "manifested" and "triangulation";
- Mother had driven G.O. to the police station, was there during his interview, and was waiting to take him home; and
- Hayden gave G.O. appropriate *Miranda* warnings, and he was not required to ask G.O. whether he wanted to waive those rights.

We agree that substantial competent evidence supports these findings.

We take issue, however, with the district court's factual findings about G.O.'s education. The district court found that Mother's testimony contradicted G.O.'s statement to Hayden that he was doing well in school, and it found that Mother said G.O. was not going to graduate on time. Yet these findings are unsupported by the record.

Mother's relevant testimony follows.

"Q. How would you describe his maturity at that time?

"A. G.O.'s always been a little less mature than his actual peers. Just— it's—he's got some mild level learning disabilities. I think that attributes to that.

"Q. Okay. What school grade was he in in March of 2017?

"A. He'd been a junior.

"Q. And how was he doing in school?

"A. By that time he was doing a lot better because he had gotten appropriate help and was moved up to their alternative education program at the high school.

"Q. Okay. So let's talk about that for a second. You said he was doing better. Had he not been doing well before?

"A. No. He had probably, I would say, C's and D's at the best, except for, like orchestra where so long as you show up and participate, you get an A.

11

"Q.  And was he on schedule to graduate?

"A.  No. He would not have graduated on time, if at all, had he not been moved up there."

True, Mother testified that G.O. had some mild level learning disabilities. Before high school, G.O. had testing accommodations—he would have the questions read to him so he could comprehend them better. But Mother testified that G.O. was doing "a lot better" in school at the time he was interviewed because he had gotten appropriate help and he had been moved to the high school's alternative education program. There, he had more one on one time and teachers made sure he got his work done. Mother agreed that G.O. was getting good grades there and that he "would not have graduated on time, if at all, had he not been moved up there." A fair reading of Mother's testimony, in context, is that G.O. was doing well in school when he was interviewed, and that he was on schedule to graduate on time.

### *The District Court's Legal Conclusions*

Our greater concern is with the district court's legal conclusions. The district court summarized its reasons supporting suppression as:  concerns about G.O.'s education, G.O.'s mental issues, G.O.'s lack of experience with law enforcement, and G.O.'s belief that the purpose of the interview was to help his stepsister. In making its decision, the district court found the case of *R.W.* "strikingly similar."

### *G.O.'s Education*

We have noted above the district court's erroneous factual findings about G.O.'s education. Contrary to the district court's findings, G.O. was doing well in his alternative educational program and was on track to graduate on time. More importantly, the record shows no link between G.O.'s mild learning disability and his oral comprehension or his

ability to respond during the interview. G.O.'s educational accommodation before high school was to have questions read aloud. And in his alternative high school program, he had more one on one time with teachers who made sure he got his work done. The record shows no more. The record of G.O.'s mild disability and his accommodations suggests no reason G.O. would not have understood his situation, Hayden's questions, or how to respond to them.

As the videotape of the interview shows, G.O.'s responses to Hayden, who asked oral questions one on one during the interview, were swift, responsive, and showed no confusion or lack of understanding. The record thus fails to show that G.O.'s mild learning disability made him more susceptible to coercion. See *Connelly*, 479 U.S. at 163-67 (low intellect no basis for finding a statement involuntary absent coercion).

*G.O.'s Mental Issues*

We have the same concern as to G.O.'s mental state. Although G.O. had experienced anxiety, depression, and attention deficit disorder, he was taking medication for one or more of those conditions, he was getting counseling, and he does not show that he either experienced or exhibited any symptoms of those conditions during his interview. Hayden was made aware of those facts during the interview yet made no attempt to exploit G.O.'s mental condition.

That a defendant has such a diagnosis is not determinative. See *State v. Swanigan*, 279 Kan. 18, 38, 106 P.3d 39 (2005) (mental condition is only one factor). In *Swanigan*, however, suppression was "heavily influenced by evidence of the defendant's low intellectual functioning and his susceptibility to being overcome by anxiety." *State v. Harris*, 284 Kan. 560, 580, 162 P.3d 28 (2007). But in *Swanigan*, unlike here, the defendant's doctor confirmed at the hearing that the defendant had difficulty in managing anxiety in custodial settings to the extent he was susceptible to being overcome by it. 279

13

Kan. at 31. And the Kansas Supreme Court's review of the record "disclose[d] that Swanigan's relatively low IQ and his susceptibility to being overcome by anxiety played a part in his alternating denials and confessions (which themselves varied considerably)." 279 Kan. at 39.

In contrast, our record fails to show that any of G.O.'s mental conditions affected his free will at the time he was interviewed. G.O. did not testify at the hearing, so we lack his subjective view of that matter. So any conclusions about what G.O. believed, thought, or understood are unfounded. Nor did any doctor testify to G.O.'s susceptibility to being overcome by anxiety or another of his mental conditions. And the record fails to show that he experienced or showed any symptoms of anxiety or his other mental conditions during his interview. To the contrary, the videotape of the interview shows that G.O.'s statements were consistent throughout the interview, were responsive to the questions asked, and many of his statements were lengthy and unsolicited. The determinative question is not whether G.O. had a mild learning disability, or a diagnosis of a mental condition, but whether law enforcement officers exploited his mental state or otherwise coerced his confession. See *State v. Johnson*, 286 Kan. 824, 837, 190 P.3d 207 (2008) (citing cases.); *Kirkland*, 2022 WL 68579, at *10 (rejecting defendant's appellate claim that mental illness rendered his incriminating statements involuntary in part based on defendant's failure to make necessary connection between his mental state and his susceptibility to coercion). The record shows no exploitation here.

*Hayden's Misleading Statements and Promises*

The district court explained that the thing that "tipp[ed] the balance" in its decision was Hayden's misleading G.O. to believe that the purpose of the interview was to help Stepsister—Hayden had told G.O. "that they were there to talk about what would help his stepsister . . . and that nobody was in trouble." The district court cited *R.W.* as support for this finding. In *R.W.*, the district court stated that "the crucial factor" in finding the 17-

14

year-old defendant's confession involuntary was "'the fairness of the officers conducting the interrogation.'" 58 Kan. App. 2d at 148.

But reliance on *R.W.*, which the district court found to be "strikingly similar" is misplaced. In *R.W.*, the circumstances were much more egregious than here. Two officers interviewed R.W. That interview lasted around four hours. 58 Kan. App. 2d at 148. And officers had reassured defendant with misleading statements that the stakes were low for 70 minutes before he made his incriminating statements. 58 Kan. App. 2d at 141.

In contrast, only one officer interviewed G.O. His interview lasted only 53 minutes. Officers initiated R.W.'s interview, but G.O. attended the interview at his Mother's request, not Hayden's. Rather than a steady barrage of reassurances for 70 minutes before R.W. made his incriminating statements, Hayden's statements about not being in trouble or being there to help Stepsister were scattered. And rather than give short, curt responses to questions by the examiner, G.O. readily volunteered at length that he had sexually abused Stepsister, and without any question by Hayden.

Hayden's statement to G.O. that he was "not under arrest won't be under arrest when we're done" was true. Far from a promise that G.O. would never be arrested for his crimes, those statements merely convey that G.O. would not be taken into custody at the end of the interview. And G.O. was not taken into custody when the interview ended or for years afterward.

G.O. asserts on appeal that "false promises, and statements that provide a defendant a false sense of security from prosecution, may render a confession involuntary." But in support, G.O. cites only cases from other states.

Under Kansas precedent, none of Hayden's statements can reasonably be objectively viewed as a promise that G.O. would not be criminally punished for his

15

actions. To render a defendant's statement involuntary, an officer must promise some specific action by a public official. *State v. Garcia*, 297 Kan. 182, 196, 301 P.3d 658 (2013); *Harris*, 284 Kan. at 579-80. For a statement to be involuntary as a product of a promise of leniency, the promise must concern action to be taken by a public official, must be likely to cause the accused to make a false statement to obtain the promised benefit, and must be made by a person the accused reasonably believes has the power or authority to execute it. 297 Kan. at 196.

No promise of specific action by Hayden was made here. Rather, Hayden's general statements about G.O. helping Stepsister or helping himself were like others that the Kansas Supreme Court has concluded were not so definite or coercive as to render a confession involuntary. See *Harris*, 284 Kan. at 579-80 (citing cases) (finding confession voluntary when defendant was given his *Miranda* warning, appeared to be intelligent and alert, had an 11th grade education and understood English, his responses were appropriate for the questions asked, and the interrogation was not particularly long).

G.O. did not testify that he was confused by any circumstances of his interview, or that he thought Hayden's statements assured him perpetual immunity for his criminal acts. So unlike the contrary conclusion in *In re M.E.*, No. 2010-G-2996, 2011 WL 3558111 (Ohio App. 2011) (unpublished opinion), which G.O. cites, we have no subjective assessment by the defendant of how the officer's statements made him feel. And the record, including the video of the interview, shows no confusion.

The record shows Hayden made no threats of harm or promises of benefit. Nor does it show Hayden's undue influence over G.O. False statements by law enforcement officers do not automatically render a suspect's confession involuntary. See *Swanigan*, 279 Kan. 18, Syl. ¶ 3. But unfair tactics led to a confession in *Swanigan*. There, law enforcement agents used false information, repeatedly insisted despite their knowledge to the contrary that they had found defendant's fingerprint at the scene of the crime, and

16

mistakenly told him that he was in pictures from the crime scene. *Swanigan*, 279 Kan. at 29, 32. The officers' false statements, coupled with evidence from Swanigan's doctor that the defendant had difficulty managing anxiety in custodial settings and was susceptible to being overcome by it, led to suppression. 279 Kan. at 31. Still, nothing like that happened here.

To be sure, "'certain interrogation techniques, either in isolation, or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment.'" *Crane v. Kentucky*, 476 U.S. 683, 687, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986). But the record shows none of those egregious techniques here. None of Hayden's statements, including those about helping Stepsister or not being in trouble, viewed under the totality of the circumstances, are egregious enough to render G.O.'s statements involuntary. See *State v. Ackward*, 281 Kan. 2, 16, 128 P.3d 382 (2006), *abrogated on other grounds by State v. Milo*, 315 Kan. 434, 510 P.3d 1 (2022) (finding officer's "mistakes in fact and law were not egregious, and in some cases they were more an exaggeration rather than false").

*G.O.'s Lack of Experience with Law Enforcement*

One other important factor distinguishes our case from R.W.'s. R.W., unlike G.O., trusted the officers who interviewed him and was vulnerable because the school resource officer who had introduced him to the officers had befriended R.W. during his father's death. R.W.'s experience with law enforcement officers was "based on emotional support, vulnerability, and trust":

"The record reflects that R.W. and the SRO bonded during a vulnerable period of mutual grief after the death of R.W.'s father and the death of the SRO's son. Prior to the interrogation, R.W.'s only experience with law enforcement was with the SRO, with

17

whom he had a 'mentor' relationship. Nothing in the record suggests that R.W. had ever had an adversarial interaction with a law enforcement officer or had previously been involved in a criminal investigation. As the district court appropriately noted, R.W.'s experience with law enforcement officers was based on emotional support, vulnerability, and trust." 58 Kan. App. 2d at 147.

The *R.W.* panel correctly found that under all the circumstances, the officers' promises, benefits, and reassurances overcame his will. See *Yarborough v. Alvarado*, 541 U.S. 652, 667-78, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004) (A confession is coerced—and inadmissible at trial—when a defendant's "will was overborne.").

Not so here. Unlike R.W., G.O. had no prior trust or other relationship with Hayden or other officers—his experience with law enforcement officers was not based on emotional support, vulnerability, or trust. G.O. agrees that the interview was cordial. He alleges no express or implied threats. Nor does the record show any promise by Hayden. Hayden identified himself as a detective, conducted G.O.'s interview in an interview room inside a police station, and gave G.O. proper *Miranda* warnings before asking any questions. As Mother had told Hayden, G.O. wanted to clear the air and get something off his chest. G.O. was compelled to confess not by any officer's overreaching acts, but by his own guilty conscience.

The State met its burden to show that more likely than not G.O.'s statements were the product of his free and independent will. Thus, the statements should not have been suppressed as involuntary.

Reversed and remanded for further proceedings.

* * *

18

HURST, J., dissenting: The State's interlocutory appeal requires this court to determine whether G.O.'s statements to Detective Hayden were voluntarily given, making them admissible against him. Although the facts are not in dispute, the majority reweighs the substantial credible evidence relied upon by the district court to reverse its sound legal decision supported by ample facts.

When reviewing a district court's decision on a motion to suppress, appellate courts examine the factual underpinnings of the decision for substantial competent evidence and review the district court's ultimate legal conclusion de novo. This court should not reweigh evidence, assess witness credibility, or resolve conflicting evidence. *State v. Garcia*, 297 Kan. 182, 186, 301 P.3d 658 (2013). I believe—as did the district court—that the totality of the circumstances under the applicable due process analysis weighs in favor of finding G.O.'s statements involuntary. Accordingly, I respectfully dissent.

The State bears the burden of demonstrating, by a preponderance of the evidence, that G.O. gave the statements freely and voluntarily. In determining the voluntariness of G.O.'s statements, this court considers the totality of the circumstances, and "recognizes a heightened sensitivity when the accused is a juvenile." *State v. Gibson*, 299 Kan. 207, 215, 322 P.3d 389 (2014). Courts consider the totality of the circumstances by analyzing nonexclusive factors such as:

(1) defendant's mental condition;

(2) the interview's manner and duration;

(3) defendant's ability to communicate on request with the outside world;

(4) defendant's age, intellect, and background;

(5) the officer's fairness in conducting the interview; and

(6) defendant's fluency with the English language.

*State v. Stone*, 291 Kan. 13, 21, 237 P.3d 1229 (2010).

Because G.O. was a juvenile at the time of his questioning, this court also considers what are commonly referred to as the *Young* factors: (1) the juvenile's age; (2) the length of questioning; (3) the juvenile's education; (4) the juvenile's prior experience with law enforcement officers; and (5) the juvenile's mental state. See *State v. Young*, 220 Kan. 541, Syl. ¶ 2, 552 P.2d 905 (1976); see also *Gibson*, 299 Kan. at 215 (recognizing an overlap exists between some of the factors applied in the adult and juvenile contexts).

This court's ultimate inquiry is whether the juvenile's statements to police were a product of his "free and independent will" or if his will was overborne through the State's coercive conduct. See, e.g., *State v. Swanigan*, 279 Kan. 18, Syl. ¶ 2, 106 P.3d 39 (2005).

I.       THE DISTRICT COURT'S FACTUAL CONCLUSIONS

The district court made some factual findings that supported its conclusion that G.O.'s statements were involuntary. However, the district court's factual findings were not as clear when it came to what, if any, factors weighed in favor of finding G.O.'s statements were involuntary, and it did not make findings as to every potential factor. The majority states that the district court identified the following factors:  (1) The interview length; (2) G.O.'s age; (3) G.O.'s mother was at the police station and knew he was with the police; (4) G.O.'s vocabulary; and (5) G.O.'s receipt of *Miranda* warnings—even without being asked if he agreed to waive them—as factors tending toward voluntariness. While it does appear the district court considered some of these factors, I disagree that the court considered G.O.'s age—16 at the time of questioning—or that his vocabulary demonstrated voluntariness.

Rather than finding these factors demonstrated voluntariness, the district court merely noted distinctions between *State v. R.W.*, 58 Kan. App. 2d 135, 144, 464 P.3d 27, *rev. denied* 312 Kan. 899 (2020), and the present case, and that G.O. was in fact younger, but close in age, to the juvenile in *R.W.*—a case in which a panel of this court

20

upheld the district court's decision to suppress the juvenile's statements. The district court similarly noted that G.O. exhibited a good vocabulary by his use of two specific words, but made no finding about that. The court ultimately juxtaposed those vocabulary words against G.O.'s need for education accommodations, that he failed classes, and that he was not on track to graduate when placed in a traditional educational environment.

This distinction is likely immaterial to the analysis because the district court did not rely on G.O.'s youth in finding the statements involuntary. Rather, the court made no factual finding regarding whether G.O.'s age, among several other factors—including his ability to communicate with the outside world—impacted the voluntariness of his statements. As such, this court may also independently consider those factors. See *State v. Harris*, 293 Kan. 798, 808-09, 269 P.3d 820 (2012) (proceeding directly to the legal conclusions "attendant to each claim without addressing whether the factual findings were supported by substantial competent evidence" when the district court "did not make specific factual findings related to the motion to suppress").

The district court determined that under the totality of the circumstances, G.O.'s statements were the involuntary result of coercion based on the following factual findings:

- G.O.'s education;
- G.O.'s mental state and issues;
- G.O.'s lack of experience with law enforcement; and
- G.O.'s misunderstanding about the purpose of the interview as a result of unfair interview tactics.

The State concedes that substantial competent evidence supported each of these findings, and merely seeks review of their legal application. Yet the majority decided to reweigh the education factor.

21

Additionally, the State claims, without any legal support, that because the district court relied on only the four identified factors, it therefore found that no other factors supported its legal conclusion. Not only does the State's argument lack legal support, it also lacks logical and practical support. The district court's identified factors merely demonstrate that those factors provide sufficient support for its conclusion. See e.g., *Gibson*, 299 Kan. at 216-17 (noting that the Kansas Supreme Court has not required district courts to consider each *Young* factor on the record). In fact, sometimes the district court makes no factual findings as to the applicable factors and merely provides a legal conclusion. See, e.g., *Harris*, 293 Kan. at 808. Similarly, if the district court had found G.O.'s statements did *not* require suppression and only cited to two factual findings supporting that conclusion—would the State still contend that no other factors could be weighed in favor of the district court's conclusion?

*G.O.'s Education*

The district court relied on substantial competent evidence to find that G.O.'s education weighed in favor of making his statements involuntary—but the majority reweighed the evidence to negate the education factor. The district court clearly discussed how it viewed G.O.'s statements about his education, his performance during the interview with law enforcement officers, and his mother's testimony about his education. The court considered all of these factors and explained that G.O. only demonstrated educational success when "he was in an alternative school, which is typically for kids that have failed or have a great deal of difficulty in regular classes in high school." Rather than rely on the district court's assessment of the competing evidence regarding G.O.'s education—the majority reweighs it and heavily relies on G.O.'s postalternative high school academic achievements to assess his education rather than the totality as the district court did.

The record reflects that G.O. has a mild learning disability, that he was less mature than his peers, that he has previously required an education accommodation of having questions read aloud to him, and that he failed multiple classes and was not going to graduate on time if he remained in a traditional educational environment. G.O.'s mother testified that he had failed high school classes and was working to get back on track through the alternative education program. She explained that through the alternative education program, G.O. was given one-on-one attention and extra help to enable him to graduate—and had he remained in a traditional educational environment he would not have graduated. These are all criteria that demonstrate G.O. was not an average learner, or capable of succeeding in the traditional educational environment for Kansas high school students.

In 2020, according to the Kansas Department of Education, just over 88 percent of Kansas students graduated from high school. Kansas Reflector, https://kansasreflector.com/2021/09/04/kansas-education-officials-celebrate-graduation-rates-but-say-work-is-far-from-over/ (September 4, 2021). According to the majority's reweighing of this evidence, being on track to graduate from high school at the time of questioning—even if that requires significant accommodations—means the juvenile has the requisite education and intellect to withstand deceptive police interview techniques. The education accommodations afforded students with mental, physical, and emotional disabilities to enable them to graduate from high school should not be mistaken for an indication that all Kansas high school graduates meet the same educational standards.

The district court relied on substantial competent evidence to find that G.O.'s education played a factor in making his statements to Detective Hayden involuntary, and I disagree with reweighing that factual finding to undermine the district court's reliance on that evidence—particularly when the State concedes the district court's factual findings. G.O. demonstrated immaturity, confusion, and misunderstanding. He had a mild learning disability, required education accommodations, failed multiple classes, and was

23

not on track to graduate prior to the significant intervention of being enrolled in an alternative education program. Nonetheless—even if this factor is not considered in the totality of the circumstances—G.O.'s statements were involuntary based on the unfair and deceptive practices employed in G.O.'s interview.

## II.    DISCUSSION

After finding the district court relied on substantial competent evidence for its factual findings—the appellate court then determines whether the district court accurately applied the law to those factual findings. This court reviews the applicable law de novo—meaning it looks at the law anew—without deference to the district court's legal analysis. *State v. Johnson*, 286 Kan. 824, 835, 190 P.3d 207 (2008) ("In reviewing a trial court's decision regarding suppression, this court reviews . . . the ultimate legal conclusion by a de novo standard, *applying independent judgment*." [Emphasis added.]). After accepting "as true the evidence and all inferences drawn therefrom that support the trial court's findings," it must then determine "whether the statement is a product of the accused's free and independent will." *State v. Jackson*, 280 Kan. 16, 36, 118 P.3d 1238 (2005).

In particular, "[a] juvenile's inculpatory statement must be voluntary and free from coercion or suggestion and must not be the product of ignorance of rights or adolescent fantasy, fright, or despair." *Gibson*, 299 Kan. at 215. Courts must therefore exercise "the greatest care" in assessing the validity of a juvenile's confession or statement to law enforcement officers. See *State v. Mays*, 277 Kan. 359, 373, 85 P.3d 1208 (2004); *R.W.*, 58 Kan. App. 2d at 144.

The district court determined that Detective Hayden's misleading conduct tipped the scale in favor of finding G.O.'s statements involuntary. Although the interview itself may appear noncombative, that is not dispositive of voluntariness—particularly when dealing with a juvenile with no prior experience with law enforcement. See, e.g.,

24

*Swanigan*, 279 Kan. at 20, 39 (finding a statement involuntary even when the defendant had been read *Miranda* warnings, and interviewers were not combative); *R.W.*, 58 Kan. App. 2d at 151 (finding juvenile statements involuntary even if *Miranda* warnings were proper and when police were not combative).

*Detective Hayden misled G.O. about the purpose and potential consequences of the interview.*

Detective Hayden's misleading and inaccurate statements, which can be categorized as unfair interview tactics, weigh heavily in favor of finding G.O.'s statements involuntary, even without consideration of G.O.'s education, mental condition, and inexperience with law enforcement. See, e.g., *State v. Morton*, 286 Kan. 632, 650, 186 P.3d 785 (2008).

Morton was a college-educated adult who the Ottawa Police Department and Government Service Administration (GSA) suspected of violating the law regarding the purchase of government surplus supplies. Morton retained an attorney to represent her in the investigation and was interviewed by a police officer with her attorney present. Thereafter, the police department closed its investigation of Morton—but several months later, Morton's attorney notified her that the GSA investigator requested an interview. Morton contacted the investigator and agreed to meet at the police station for an interview but did not bring her attorney. Morton asked the investigator if she needed an attorney, and the investigator responded that it was not "that kind" of interview—so Morton proceeded without her attorney present.

The Kansas Supreme Court found that Morton was not required to receive *Miranda* warnings because it was a noncustodial interview, but that Morton's question was an attempt to determine the nature of the interview. The dual civil/criminal investigatory powers of the GSA made the true nature of the interview unclear and the

court found the investigator's statement was "an affirmative misrepresentation about the true nature of the interview." Under the totality of the circumstances, the court found that the interviewing agent's misrepresentation about the true nature of the interview to a college-educated adult, with no disclosed mental health conditions, who had prior experience with law enforcement in the very same action—rendered her statements involuntary. *Morton*, 286 Kan. at 654.

Detective Hayden repeatedly lied to G.O. about the purpose and intent of the interview, made false promises of benefit, misled G.O.'s mother about the true purpose of the interview, and used G.O.'s mother to buttress his credibility and authority, all in an attempt to elicit incriminating statements from a 16-year-old with a mild learning disability, mental health issues, and who had no prior experience with law enforcement—in order to conceal the true purpose and potential consequences of the interview, and thus deprive G.O. of his free and independent will to voluntarily speak to the detective.

1. *Detective Hayden's False Statements About the Interview Purpose*

Detective Hayden began by lying to G.O. about the actual purpose of the interview. Of course, police may lie to suspects during the course of an interrogation—but Detective Hayden's deceptive conduct is a factor when considering the fairness of the interview and the totality of the circumstances demonstrating whether the interview was coerced. See, e.g., *Morton*, 286 Kan. at 632, Syl. ¶ 8. Unlike the facts of this case, the majority relies on cases where the defendants all knew they were being interviewed for the purpose of investigating a crime. See *Garcia*, 297 Kan. at 196; *State v. Harris*, 284 Kan. 560, 579-80, 162 P.3d 28 (2007). G.O. was repeatedly told that his conversation with Detective Hayden was not for the purpose of getting anyone into trouble—but expressly to "help" his sister deal with her mental health issues.

26

While the detective did introduce himself as "Detective Hayden" and then explained that he had "been a police officer for 15 some odd years now" and had "been a detective for 8 or 9 of those," he made it seem as though his current job differed from his prior job. He first explained that he previously worked on things "all the way down to you know, theft and shoplifting stuff kinda down here at the low end; I've worked a lot of homicides like these guys are working today. And that's kinda the big deal, right, when people die." The detective then explained how his job had changed, and said "[n]ow, I work a lot with kids. Usually young, young kids, ok. The past few weeks I've been kinda talking to your sister—helping—trying to help her out." G.O. responded, "I want her to get better," referring to his sister, and Detective Hayden said "[y]ep. Me too."

Detective Hayden described his current job of working with young kids in contrast to his prior job—and never disclosed that his job was to investigate crimes against children. Detective Hayden never told G.O. that he was investigating him, or that he was investigating crimes against G.O.'s sister, or even that his job was to investigate crimes against children. He said that he works with kids and repeatedly said he was just trying to "help" G.O.'s sister—and in fact help G.O.

The detective told G.O. the interview was to "help [his sister] out" and "so we can help to understand it." After telling G.O. he was not currently under arrest and would not later be arrested, the detective said the purpose of the interview was to "get some stuff cleared up" and "clear some things up for you and your sister." At least six different times during the course of the one-hour interview, Detective Hayden referred to the purpose of the interview as being to help G.O.'s sister with her feelings, to help her out, or to clear things up.

Detective Hayden's expressed desire to help G.O.'s sister do better prompted G.O. to talk about his sister's mental health issues, and how she had been sent to a mental health facility. G.O. said he wanted to "make sure she does better." G.O. then began to

discuss his own experience of being sexually abused and Detective Hayden explained that:

> "[s]o you know, the research kind of bears out—and my experience bears out—that when these things happen, it's not just because they've happened out of the blue, alright? A lot of times these things happen because things have happened to people in the past, right? And those things start to kind of manifest themselves . . . and people become curious, right? And things start to happen, and it kind of gets out of our hands before we kind of really know what's going on, right?"

Detective Hayden said that G.O.'s mom had told him about G.O. being abused, and then asked G.O. to provide more details about his own abuse. When G.O. expressed reluctance to give details, saying "I don't like doing details," Detective Hayden reassured him that some of what they were going to discuss would be "uncomfortable" and "probably a little bit embarrassing," but that he had "been doing this for quite a while and I can guarantee you almost 98 and a half percent that anything that you're going to tell me . . . I've already heard. And it's not going to shock me." Detective Hayden went on to reassure G.O. that "from the things that [your sister] and I talked about, alright, this is not anything that's uh—well, how should I say this—it's more common than people think." And that "[s]o it's just something that you and I are going to talk about so that we can move past it to help [your sister] out."

Early in the interview, Detective Hayden explained the purpose of the meeting by saying, "I think you know that your sister's kinda hurting right now . . . [s]o if we can get some of this stuff cleared up and kinda aired out, I think that's going to help out everybody. Ok?" Later in the interview he expands on how G.O.'s sister's feelings, "I think she is confused. And you know, she's a teenager. . . . She's female, which you know, there's hormones at play there too. Just like with you and I when we were teenagers—you still are, so you know how that goes. I don't think kids are real nice to her at school, so she's got a lot she's trying to figure out." He goes on to state that the reason

28

he is talking to G.O. is to help his sister work out her feelings about G.O. "I know she swing[s] back and forth on how she feels about you. . . . Uhm, but that's kind of why—why we're trying to get through this today."

Detective Hayden was interviewing G.O. about his sexual assault of his stepsister, which appears to have started when G.O. was about 12 years old. The detective never disclosed that he was investigating a crime, that he was investigating G.O., that G.O.'s conduct was criminal, the potential for criminal charges against G.O. for that prior conduct, or any potential "trouble." In fact, Detective Hayden repeatedly and consistently told G.O. that he would not be arrested and that he was not in trouble, and the purpose of the discussion was therapeutic—to help G.O.'s sister, to help G.O. and his sister move past this, to clear things up, and to help G.O.'s relationship with his sister. G.O. echoed that language back to Detective Hayden as his purpose and intent as well. These were not communicated as a tangential result of a criminal investigation—but was the only stated purpose to G.O. for the interview.

The majority seeks to distinguish *R.W.* by noting that G.O.'s interview was shorter, and there was only one detective present—but those factors do not negate that same coercive technique employed here, when the detective intentionally described his role as that of a pseudo-therapist, and never disclosed that G.O. was the subject of a criminal investigation. Having only one detective present made the interview more similar to therapy than an interrogation, and the interview was short in part because G.O. had an orthodontist appointment and Detective Hayden had already employed this coercive technique with G.O.'s mother. Unlike in *R.W.*, G.O. was aware of the topics to be discussed with the detective—but just like in *R.W.*—the detective concealed and, in fact, lied about the purpose of the interview and also lied about any potential consequences—repeatedly promising there would be none.

29

Detective Hayden hid the true purpose of the interview by telling G.O.—a juvenile—that it was therapeutic in nature and designed to help him and his sister, who had ongoing mental health struggles. Under the facts of this case, this technique was coercive and factors into the totality of the circumstances to make G.O.'s interview statements involuntary.

2.      *Detective Hayden's False Promises of Benefit*

Not only did Detective Hayden describe the interview in terms of therapeutic purposes—he made specific promises of benefit to further mislead G.O. about the purpose and potential consequences of the interview. G.O. claims on appeal, as he did in the motion to suppress hearing, that the detective's false statements and promises rendered his statements involuntary. I agree with the majority that the Kansas Supreme Court has held that only a "promise [of] some specific action by a public official" can render a defendant's statement involuntary. See *Garcia*, 297 Kan. at 196. Detective Hayden repeatedly promised G.O. he would not be arrested or be in any trouble if he fully disclosed the requested information.

The majority cites to Detective Hayden's recitation of G.O.'s *Miranda* warnings to demonstrate that his statements were voluntary—but *Miranda* warnings alone do not render otherwise coercive techniques permissible. See, e.g., *State v. Swindler*, 296 Kan. 670, 683-84, 294 P.3d 308 (2013) (finding statements involuntary even when defendant had been read *Miranda* warnings); *State v. Stone*, 291 Kan. 13, 15, 32-33, 237 P.3d 1229 (2010) (finding statements involuntary even when defendant was read and waived *Miranda* rights). Particularly when those *Miranda* warnings are repeatedly negated by contrary statements and promises of benefit should the defendant not invoke their rights under *Miranda*. Just before reading G.O. his *Miranda* rights, the detective said, "Like I said, you're not under arrest, you're not going to be under arrest." The detective further minimized G.O.'s *Miranda* rights when he explained them by saying—after promising no

30

repercussions from the discussion—"[b]ut we're kinda sitting in this room, right. So I'm going to read you your Miranda rights. Just so you—you can make sure that you understand, ok?" After reading the *Miranda* warnings the detective asked G.O. if he understood "those rights" and G.O. said he did. Although not required, it is notable—considering the methods Detective Hayden employed to conceal the nature of the interview—that he did not ask if G.O. wished to waive those rights. Thereafter, in contradiction to the *Miranda* rights previously read to G.O., the detective said that if G.O. did not tell the detective the complete truth "that's when things start to get out of control, right." The obvious implication was that Detective Hayden's promises of benefit required G.O. to make full and complete disclosures, and to not invoke his right to silence.

Here the State asks this court to presume that G.O. understood and believed the *Miranda* warnings read to him by Detective Hayden such that he could invoke them anytime, and also that G.O. should have known Detective Hayden was repeatedly lying to him about the purpose and consequences of the interview. Receiving *Miranda* warnings is just one factor comprising the totality of the circumstances in determining if the detective's deceptive interview techniques violated G.O.'s due process rights. Courts have consistently found police interrogations mentally coercive even when *Miranda* warnings are read to adults. See, e.g., *Garcia*, 297 Kan. at 197; *Stone*, 291 Kan. at 32-33; *Swanigan*, 279 Kan. at 40; *State v. Howard*, 825 N.W.2d 32 (Iowa 2012); *Cole v. State*, 923 P.2d 820 (Alaska Ct. App. 1996).

Although the factors supporting the totality of the circumstances warranting suppression of G.O.'s statements differ from those in *R.W.*—this particular factor is quite similar. Not only did the detective's strategy of presenting himself as a pseudo-therapist seek to overcome G.O.'s free and independent will—the detective also affirmatively promised G.O. benefits for his statements which contributed to him being overborne. The detective also undermined the cursory *Miranda* warning by stating there would be no "trouble" from G.O.'s statements and also implying negative consequences from not

31

giving full, complete disclosure. See, e.g., *Stone*, 291 Kan. at 22-24, 32-33 (where the court found the statements involuntary where the police officer inferred that confession would positively affect the defendant's jail sentence).

The majority relies on *Harris* for the proposition that "none of Hayden's statements can reasonably be objectively viewed as a promise that G.O. would not be criminally punished for his actions." Slip op. at 16. First, the majority inflammatorily misstates G.O.'s argument. He is not arguing that Detective Hayden promised he would not be prosecuted for his actions—nor am I contending he should not be prosecuted for his actions because of Detective Hayden's promises. Rather, he argues that Detective Hayden's promises made his statements involuntary and thus his statements to Detective Hayden cannot be used in his prosecution. Rendering the statements inadmissible does not prevent the State from prosecuting G.O. using all other admissible evidence at its disposal. The implication that enforcement of a defendant's fundamental due process rights somehow prevents the State from prosecuting criminal conduct contradicts the fundamental principles of our legal system.

Unlike Harris, who knew he was facing murder charges when he spoke to police, here, the police never told G.O. or his family that Detective Hayden wanted to question him in connection with potential criminal charges. Contrarily, Harris, had already been charged, and his photo widely publicized as a person being sought in connection with murder charges. Harris knew his photo was shown on the news and he willingly contacted police and presented himself for questioning in connection with murder charges. Unlike G.O., Harris was never told the interview was not "about getting people in trouble," that Harris was "not under arrest," or that he was "not going to be under arrest." Therefore, any minimal promises of leniency by the police in that case are clearly distinguishable from what occurred to G.O. in this case.

32

Even assuming that G.O. somehow understood there was a possibility of his interview being used for his legal prosecution—despite Detective Hayden's repeated promises to the contrary—he engaged in a promise of benefit in exchange for G.O.'s statements. A promise of leniency may result in a defendant's statement being involuntary when that promise:

(1) concerns action to be taken by a public official;

(2) is likely to cause the accused to make a false statement to obtain the promised benefit; and

(3) is made by a person the accused reasonably believes has the power or authority to execute it.

*Garcia*, 297 Kan. at 196-97.

Here, as in *Garcia*, the person making the promise was a police detective—a public official—which meets the first criterion.

Next, the promises must be of the type to make someone willing to make a false statement—in other words, the promise must be sufficiently beneficial. Here, the promises were that G.O. was "not going to be under arrest," which was said twice in the hour-long interview and that the interview "isn't about getting people into trouble," but was "about trying to fix some things" and to "help" G.O.'s sister. It is difficult to imagine a more beneficial promise to a juvenile who was having trouble at home and had told the detective "I've had many upon many anxiety and panic attacks" and that "for weeks upon weeks just constant anxiety attacks" than not getting into "trouble," not getting arrested, and helping his sister, who was also suffering with mental health issues.

Finally, the promises were made by Detective Hayden, and it was reasonable for G.O. to believe that the detective had the power or authority to execute on at least the legal promises. Assuming that Detective Hayden's promises to help G.O.'s sister and to "swing" her feelings back toward fondness for G.O. are not the type of benefit

contemplated by this standard—the promise that G.O. would not get into trouble or be arrested—are clearly promises G.O. would believe Detective Hayden could uphold. The majority claims that Detective Hayden's promise that G.O. would not be arrested is somehow not false because two years had passed from when Detective Hayden made the promise and when the State charged G.O. That contention is not only contrary to the common definition of a lie, but it is also irrelevant to this analysis. The point is that Detective Hayden promised G.O. a benefit, whether true or not, in exchange for his interview. Of course had the benefit been true—this case would not be before this court.

Detective Hayden told G.O.—a juvenile—multiple times that he would not be arrested or be in any trouble if he completely disclosed the details of his sexual abuse of his sister that occurred several years prior to the interview when G.O. was 12 to 14 years old. It was reasonable for G.O. to rely on those promised benefits made by a public official. Detective Hayden also said the interview would "help" G.O.'s sister and could benefit G.O.'s relationship with his sister, but this court need not determine whether G.O. should have reasonably believed Detective Hayden could execute those promises.

3.    *Detective Hayden's Use of G.O.'s Mother*

Not only did Detective Hayden rely on his own authority to deliver the promised benefit and mislead G.O. about the interview purpose, but he invoked and relied on G.O.'s mother as an authority. Right from the beginning of the interview, Detective Hayden referenced his discussions with G.O.'s mother to bolster his misstatements that the interview would be used therapeutically to help G.O. and his sister, and would not be used to get G.O. into any "trouble." Detective Hayden said, "Your mom probably told you but I'm going to tell you again, alright. You are not under arrest," and after G.O. acknowledged that he understood, Detective Hayden immediately said "[y]ou're not going to be under arrest when we're done." He further explained that his purpose was to

34

"clear some things up for you and your sister" because G.O.'s "sister's kinda hurting right now."

Detective Hayden referenced his personal conversations with G.O.'s mom on multiple occasions, but specifically to reinforce that G.O. would face no legal repercussions or "trouble" resulting from his full disclosure. Shortly after G.O. expressed reluctance to provide details—"I don't like doing details"—Detective Hayden told G.O. that anything less than full disclosure is when "things start to get out of my control." Detective Hayden told G.O.:

> "I also told your mom, right, that—that, you know, things—things start to get out of my control. Like if we talk here for—for 45 minutes and you tell me what happened and, uh, I go and I find out that some of those things aren't true, or some of the things that you tell me wasn't everything—that's when things start to get out of control, right. And I'm not saying that you're going to do that. I don't think you're going to even try to do that. I know you want to get these things off your chest. That's what your mom told me and that's what it seems like so far, right. But I just want to warn you, right. That I don't want to go down that road and neither do you and neither does [your sister]."

Detective Hayden told G.O. that he made the same beneficial promises to G.O.'s mom—relying on G.O.'s mother as a trusted authority to bolster these promises.

G.O.'s mother mistakenly believed she was required to have her entire family, including G.O., submit to police interviews with Detective Hayden—and Detective Hayden never assuaged her of that belief. He never told her that G.O. had the right to remain silent, have an attorney present, or that she could refuse to make him available unless she was present. G.O.'s mother actually asked to be present during the interview but, in front of G.O., Detective Hayden said that she could not be present—preemptively cutting off G.O.'s ability to communicate with the outside world. It is true that Detective Hayden was not required to relieve G.O.'s mom of her misunderstandings—but he then

35

relied on those misunderstandings to buttress his promises to G.O. See *Garcia*, 297 Kan. at 194-98.

Garcia, an adult defendant with prior experience with law enforcement who was well aware police were interrogating him related to criminal charges, accused police of eliciting an involuntary confession by promising him leniency. Unlike here, the police were careful not to outright promise Garcia anything, but instead used his girlfriend to convey that if he confessed to robbery the police would not charge him with a more serious crime. The police officer had Garcia's girlfriend stand in the doorway and asked her to talk to her boyfriend:

> "'[Police Officer:] She is going to stand in that door and she is going to tell you that I talked to her and she told the truth.
> "'[Garcia:] Okay.
> "'(Sergeant leaves room and then returns with unidentified female)
>
>      . . . .
>
> "'[Girlfriend:] Do you want to go in for murder or robbery?
> "'[Garcia:] I'm fuckin' pretty sure (Inaudible). You know that.
> "'[Girlfriend:] Baby, at least don't go down for murder.
> "'[Garcia:] But I didn't even do shit.. . . .
> "'[Police Officer:] *Go ahead, explain to him. Help me help him.*
> "'[Girlfriend:] They are going to take you down for murder if you don't—if you don't say about the—
> "'[Garcia:] I know they are going to take me down for murder, (Inaudible) for fuckin' robbery, all of this, because they are going to book both on me later on when I get to the fuckin' station.
> "'[Girlfriend:] They're not going to book you for murder.
> "'[Garcia:] All right, man, I did, I did try to rob that guy.
> "'[Girlfriend:] But he didn't—he really did, he really tried to stop him. He tried to stop him from shooting the guy. He really did.'" (Emphasis added.) 297 Kan. at 195.

The court found that the exchange with Garcia's girlfriend "did not stop short of promising a benefit to Garcia in return for his confession to robbery." 297 Kan. at 196. Although the police officer did not convey the promise, it was nonetheless referring to police conduct, and the promise "fits within the parameters of those promises that may be deemed to have rendered a confession involuntary." 297 Kan. at 196-97. Like the officers in *Garcia*, here, Detective Hayden met with someone G.O. trusted—his mother—and according to his own statement to G.O.—told her that G.O.'s statements during the interview would not be used to arrest him. He then relied on G.O.'s mom to convey that information to G.O.—not only that—he told G.O. that he had, in fact, made those promises to his mother.

Detective Hayden repeatedly telling G.O. the purpose of the interview was to help his sister who was suffering, promising G.O. there would be no legal consequences resulting from his interview if he provided a full confession, and telling G.O.'s mom the same while also relying on her as an authority of G.O., all combined to create an unfair interview such that G.O.'s statements were not the product of his free and independent will. See, e.g., *Stone*, 291 Kan. at 32-33 (finding a combination of interrogation techniques coercive as to an adult).

*G.O.'s Mental State*

It is undisputed that G.O. suffered from anxiety, depression, and ADD at the time of his interview with Detective Hayden. His mother testified that he was on medication for ADD and anxiety, but that "[She did not] remember which" anxiety medication because "[i]t's changed so much now." During the interview, G.O. told Detective Hayden that "I've had many upon many anxiety and panic attacks," and "I have medicine to deal with anxiety issues. And just for weeks upon weeks just constant anxiety attacks." He further explained that his anxiety was "random anxiety attacks about nothing," and were not caused by a particular event, "it's just sometimes it's out of the blue" and "[t]hat's one

37

of the main issues that the medicine tries to deal with." G.O. summarized by saying, "And it sucks."

G.O. did not testify at the suppression hearing about his mental state during the interview, and there is no requirement that he do so. This court must analyze the facts presented to determine if Detective Hayden's conduct was sufficiently coercive so as to overcome G.O.'s free and independent will under the totality of the circumstances. Additionally, Detective Hayden's decision to remain ignorant of G.O.'s mental condition, education, and maturity level prior to conducting the interview does not alleviate him of the consequences of coercion on someone in G.O.'s position.

It is true that the defendant's mental condition alone, without any alleged coercive interview techniques, does not necessarily make a witness statement involuntary without a showing of how that condition impacted the witness. See *Johnson*, 286 Kan. at 837. But, when there are other factors making the interview coercive, the defendant's mental condition can be considered a factor in analyzing the totality of the circumstances. *Swanigan*, 279 Kan. at 37. Where there is no evidence contradicting the defendant's mental condition, as is the case here, this court should not seek to reweigh or eliminate this factor based on evidence the defendant could have provided to strengthen its contention.

Here, unlike the facts in *Johnson* and *State v. Kirkland*, No. 122,971, 2002 WL 68579 (Kan. App. 2022) (unpublished opinion), G.O.'s mental condition is not the only factor being asserted to demonstrate his statements were involuntary. See *Johnson*, 286 Kan. at 836 (When the defense focuses only on the accused mental condition, "the absence of other factors is an important consideration" when determining whether low intellect or other mental condition alone made the defendant's waiver involuntary.); *Kirkland*, 2002 WL 68579, at *10.

*G.O.'s Lack of Experience with Law Enforcement*

It is undisputed that G.O. had never been arrested or interviewed by law enforcement prior to his interview with Detective Hayden. He had no experience with law enforcement in an adversarial manner. Rather than credit his lack of experience as a factor weighing toward coercion, the majority focuses on the unique facts of *R.W.*—where the defendant had a prior, friendly relationship with an interrogating officer—to conclude that G.O.'s interview was not coercive. The unique facts of *R.W.* should not be used to reframe this factor.

The relevant analysis is whether G.O.'s complete lack of experience with law enforcement techniques is a factor tending to demonstrate involuntariness in his statements. See, e.g., *Young*, 220 Kan. at 547 (describing how lack of any experience with "police practices" can be considered in rendering a juvenile confession involuntary). As previously explained, G.O. would have had to know and understand that police lie to juveniles about the purpose and consequences of interviews in order to have understood the implications of the *Miranda* warnings. G.O., having no prior experience with police techniques, was less likely than adults or more experienced juveniles to realize that Detective Hayden was lying to him in order to elicit a confession that could be used to criminally prosecute G.O.

This is just one factor to consider when analyzing the totality of the circumstances. It alone is not dispositive—but G.O. need not show that he had a prior relationship with Detective Hayden that contributed to his misunderstanding of his rights. He merely needs to assert that he had no prior experience, which he has done.

*The Totality of the Circumstances*

The totality of the circumstances here demonstrate that G.O. did not voluntarily and knowingly waive his *Miranda* rights and confess to criminal conduct. Detective

Hayden repeatedly told G.O. that his interview was for therapeutic-type purposes to help his sister overcome her mental health struggles. Detective Hayden also promised G.O. that his full disclosure during the interview would ensure that he would not get into trouble and would not be arrested. That promised benefit strengthened Detective Hayden's claims regarding the purpose of the interview. These unfair interview techniques, coupled with G.O.'s education, mental health issues, inexperience with law enforcement, and his youth all created a coercive interview rendering G.O.'s statements involuntary. A juvenile's "inculpatory statement[s] must be voluntary and free from coercion or suggestion and must not be the product of ignorance of rights or adolescent fantasy, fright, or despair." *Gibson*, 299 Kan. at 215. See *Mays*, 277 Kan. at 373; *R.W.*, 58 Kan. App. 2d at 144. G.O.'s statements were clearly the product of ignorance resulting from the detective's deceptive techniques under the circumstances.

This court must use great care when assessing the validity of juvenile confessions—particularly when the determination is such a "close call" as agreed by the majority.

As such, I respectfully dissent.